HENRY TOLAND, PLAINTIFF IN ERROR v. HORATIO SPRAGUE.

Process of foreign attachment cannot be properly issued by the circuit courts of the United States, in cases where the defendant is domiciled abroad, or not found within the district in which the process issues, so that it can be served upon him.

The true construction of the eleventh section of the judiciary act of 1789, is, that it did not mean to distinguish between those who are inhabitants, or found within the district, by process issued out of the circuit court, and persons domiciled abroad; so as to protect the first, and leave the others not within the protection: but even with regard to those who are within the United States, they should not be liable to the process of the circuit courts of the United States, unless in one or other of the predicaments stated in the clause. And as to all those who were not within the United States, it was not in the contemplation of congress that they would be at all subject, as defendants, to the process of the circuit courts; which by reason of their being in a foreign jurisdiction, could not be served upon them; and therefore there was no provision whatsoever in relation to them.

By the general provisions of the laws of the United States: 1. The circuit courts can issue no process beyond the limits of their districts. 2. Independently of positive legislation, the process can only be served upon persons, within the same districts. 3. The acts of congress adopting the state process, adopt the form and modes of service only, so far as the persons are rightfully within the reach of such process; and did not intend to enlarge the sphere of the jurisdiction of the circuit courts. 4. The right to attach property to compel the appearance of persons, can properly be used only in cases in which such persons are amenable to the process of the circuit court, in personam; that is, where they are inhabitants, or found within the United States; and not where they are aliens, or citizens resident abroad, at the commencement of the suit, and have no inhabitancy here.

In the case of a person being amenable to process, in personam, an attachment against his property cannot be issued against him; except as a part of, or together with process to be served upon his person.

The circuit court of each district, sit within and for that district, and are bounded by its local limits. Whatever may be the extent of the jurisdiction of the circuit court over the subject matter of suits, in respect to persons and property, it can only be exercised within the limits of the district. Congress might have authorized civil process from any circuit court to have run into any state of the Union. It has not done so. It has not, in terms, authorized any civil process to run into any other district; with the single exception of subpœnas to witnesses within a limited distance. In regard to final process, there are two cases, and only two, in which writs of execution can now by law be served in any other district than that in which the judgment was rendered; one in favour of private persons in another district of the same state; and the other in favour of the United States, in any part of the United States.

A party against whose property a foreign attachment has issued in a circuit court of the United States, although the circuit court had no right to issue such an attachment, having appeared to the suit, and pleaded to issue, cannot afterwards deny the jurisdiction of the court. The party had, as a personal privilege, a right to refuse to appear; but it was also competent to him to waive the objection.

[Toland v. Sprague.]

The judiciary act of 1789 authorizes the Supreme Court to issue writs of error to bring up final judgments or decrees in a civil action, &c. The decision of the circuit court upon a rule or motion is not of that character. Such decisions are not final judgments.

No principle of law is better settled, than, that to bring a case within the exception of merchandise accounts between merchant and merchant, in the statute of limitations, there must be an account; and that, an account open or current: that it must be a direct concern of trade: that liquidated demands on bills and notes, which are only traced up to the trade or merchandise, are too remote to come within this description. But when the account is stated between the parties, or when any thing shall have been done by them, which by their implied admission is equivalent to a settlement, it has then become an ascertained debt. Where there is a settled account, that becomes the cause of action, and not the original account; although it grew out of an account between merchant and merchant, their factors or servants.

T. shipped a quantity of merchandise by P. to Gibraltar, who on arriving there placed the goods in the hands of S., and received advances from S. upon them. In 1825, S sold the goods and transmitted an account sales, as of the merchandise received from P. to T., who received it in September, 1825, stating the balance of the proceeds to be two thousand five hundred and seventy-eight dollars. T. in 1825 wrote to S., directing him to remit the amount to him, deducting one thousand dollars, which had been advanced by S. on the goods, and which had been remitted by P. to T. S. refused to make the remittance, alleging that P. was largely indebted to him. No suit was instituted by T. against S. until August, 1834. The account was a stated account; and the statute of limitations applied to it.

The mere rendering an account does not make it a stated account; but if the other party receives it, admits the correctness of the items, claims the balance, or offers to pay it, as it may be in his favour or against him, then it becomes a stated account. It is not at all important that the account was not made out between the plaintiff and the defendant; the plaintiff having received it, having made no complaint as to the items or the balance; but, on the contrary, having claimed that balance, thereby adopted it, and by his own act treated it as a stated account.

T. shipped merchandise consigned to P. as supracargo.; P. put the goods into the hands of S., a merchant of Gibraltar, as the merchandise of T., and received an advance upon them. S. having sold the merchandise, rendered an account of the sales, stating the sales to have been made by order of P., and crediting the proceeds in account with P. The account came into the hands of T. in 1825; and he claimed the balance of the proceeds from S., deducting the advance made by S. to P.; and payment of the same was refused by P. *Held*, that as T. had a right in 1825 to call on S. to account, and as no suit was instituted against S. until 1834; S. having always denied his liability to T. for the amount of the sales, from the time of the demand; the statute of limitations was a bar to an action to recover the amount from S.

The effect and nature of an averment in a plea put in by a defendant, when it is not essential to the plea.

Where the items of an account stated were not disputed, but were admitted, and payment of the same demanded; it was not taking the question of fact, whether the account was a stated account, from the jury: for the court to instruct the jury that the account was a stated account.

[Toland v. Sprague.]

ERROR to the circuit court of the United States for the eastern district of Pennsylvania.

This action was commenced on the fifth day of August, 1834, by the plaintiff in error, by process of foreign attachment, in the circuit court for the eastern district of Pennsylvania. The writ of attachment stated the defendant, Horatio Sprague, to be a citizen of the state of Massachusetts, and the plaintiff to be a citizen of the state of Pennsylvania. The attachment was served on the property of the defendant on the sixth day of August, 1834, in the hands of Mr. John M'Crea, Mr. S. Brown, and Mr. P. Lajus, residents in the city of Philadelphia. At the following term of the circuit court, the counsel for the defendant moved to quash the attachment; which motion was overruled by the court.

The record showed that Horatio Sprague, although stated to be a citizen of the state of Massachusetts, was at the time of the commencement of the suit, and for some years before, had been a resident at Gibraltar; where he was extensively engaged as a merchant. The defendant entered special bail to the attachment; and having appeared and pleaded to the same, the case was tried by a jury on the twenty-first day of November, 1836; and a verdict, under the charge of the circuit court, was rendered for the defendant, on which a judgment was entered by the court.

The plaintiff at the trial took a bill of exceptions to the charge of the court, stating in full all the evidence given to the jury in the case. The plaintiff prosecuted this writ of error.

The plaintiff declared in assumpsit, on three counts against the defendant: First, charging the delivery of certain articles of merchandise, upon a promise to account and pay over the proceeds of the sale of the same; alleging a sale thereof by the defendant, and a breach of promise, in not paying or accounting for the same. Second, a count in indebitatus assumpsit: and third, on an account stated: The third count was afterwards, on the application of the plaintiff to the court, struck out of the declaration. The defendant pleaded the general issue, and also the statute of limitations. The plaintiff replied that, at the time of the transactions with the defendant, in which this suit was brought, the defendant was a merchant and the factor of the plaintiff, and " as such had the care and administration of the money, goods, wares, and merchandise, in the said declaration mentioned, of the said Henry; and he merchandised and made profit

[Toland v. Sprague.]

of for the said Henry, and to render a reasonable account to the said Henry, when he, the said Horatio, should be thereunto afterwards required; and that the said money, in the said several promises and undertakings in the said declaration mentioned, became due and payable on trade had between the said Horatio and the said Henry, as merchants and merchant and factor, and wholly concerned the trade of merchandise between him, the said Henry, as a merchant, and the said Horatio as a merchant and factor of him, the said Henry, to wit, at the district aforesaid: and the said Henry further says, that no account or accounts whatever of the said money, goods and merchandise, in the said declaration mentioned, or any part thereof, was, or were ever stated, settled, or adjusted between him the said Henry."

To this replication the defendant rejoined, stating that he was not the factor of the plaintiff; nor did the said money, in the said several supposed promises and undertakings, in the said declaration mentioned, become due and payable in trade had between the said Horatio Sprague and the plaintiff, as merchant and merchant and factor, in manner and form as the plaintiff had alleged.

The bill of exceptions set out at large the evidence given on the trial of the cause. It consisted of a letter, dated Philadelphia, September, 25, 1824, from the plaintiff to Charles Pettit, by which certain goods and merchandise, the property of the plaintiff, shipped on board of the William Penn, bound to Gibraltar, was consigned to him for sale, and stating the manner in which returns for the same were to be made; letters from Charles Pettit to the plaintiff, relative to the shipment, and a statement of remittances made to him by Charles Pettit, with an account sales of some of the merchandise; also two bills of exchange, one for five hundred and thirty dollars seventeen cents, the amount of the proceeds of sales of eleven hogsheads of tobacco, and a bill of exchange for one thousand dollars, both drawn by Horatio Sprague, the defendant, on persons in the United States, to the order of Charles Pettit, and by him endorsed to the plaintiff.

By a letter from Charles Pettit to the plaintiff, dated at Gibraltar, December, 1824, after communicating the sales of the eleven hogsheads of tobacco, and the enclosure of the bills, and stating that the bill for one thousand dollars was to be considered as an advance on his shipment, he informed the plaintiff:

" I shall sail from this to-morrow, in the ship William Penn, for Savannah, and have left the following instructions with my friend,

Mr. Sprague, regarding your property left by me in his hands: ' With respect to the gunpowder tea, cassia, and crape dresses, shipped by Henry Toland, you will please to dispose of them as you may think most for the interest of the shipper, and remit the amount to him, in bills on the-United States; forwarding me account of sales of the same.' "

By a letter addressed by Charles Pettit to the defendant, Mr. Sprague; written at Gibraltar, on the 18th December, 1825; he says, among other things:

" By your account current rendered this day, a balance stands against me of five thousand five hundred and seventy-four dollars thirty-one cents; to meet which you have in your possession 550 barrels superfine flour, on my account entire, my half interest of 372 barrels flour; an invoice of crapes, &c. amounting to two thousand and twenty dollars; 100 ten-catty boxes gunpowder tea; 500 bundles cassia; and 2 cases super satin Mandarin crape dresses, containing 101 dresses.

" With respect to the gunpowder tea, cassia, and crape dresses, shipped by H. Toland, you will be pleased to dispose of them as you may think most for the interest of the shipper, and remit the amount to him in a bill on the United States; forwarding me account sales of the same."

On the 6th of January, 1825, the plaintiff wrote to the defendant, from Philadelphia, " I am expecting soon to hear the result of my shipment by the William Penn, and hoping it will be favourable."

On the 22d February, 1825, the plaintiff addressed the following letter to the defendant:

" *Philadelphia, February 22, 1825.*
" Mr. Horatio Sprague, *Gibraltar.*

" Dear Sir,—By the ship William Penn, I consigned to Mr. Charles Pettit 100 boxes gunpowder tea, a quantity of cassia, 11 hogsheads Kentucky tobacco, and 2 cases Mandarin robes. I directed Mr. Pettit to make the returns of this shipment *immediately* on his arrival at Gibraltar, as follows: If quicksilver could be had at forty cents, then the whole amount in said article; if not, to ship the whole amount in dollars, by the *first vessel* for this port, or New York; or if good bills of the United States could be had on more favourable terms for a remittance, then to make the return in bills. Mr. Pettit promised a strict compliance with all these things; but, since the

sailing of the William Penn from this port, I have never received a line from him. I have heard of his arrival in Savannah, and of his proceeding to Charleston; but I have not yet been favoured with a sing'e letter from him.

" As my property may be left in your hands by him, unsold, I beg of you to follow the directions given to him, as herein detailed, and make the remittance direct to me. ⋅ I have particularly to beg your attention to this matter, and to remit as early as possible."

The bill of exceptions also contained letters from the defendant to the plaintiff, written at Gibraltar, commencing on the 18th January, 1825, to February 22, 1827; and other correspondence of the plaintiff with the defendant, up to an anterior date.

The letters of the plaintiff assert the liability of the defendant to him for the whole amount of the shipment made to Charles Pettit; deducting the two bills of exchange; one for five hundred and thirty dollars seventeen cents, and the other for one thousand dollars; the balance of the sales being one thousand five hundred and seventy-nine dollars.

The letter from the defendant to the plaintiff, of the 18th January, 1825, informs the plaintiff, " that Charles Pettit had left Gibraltar on the 19th of December, and had placed in his hands, for sale for his account, ⅄ invoice of gunpowder tea, cassia, and crape dresses; with directions to dispose of them as he may judge most for his interest; which shall have my best attention."

Letters written afterwards inform the plaintiff of the state of the markets at Gibraltar; and on the 7th of June, 1825, the defendant wrote to the plaintiff, " I have closed the sales of the crapes and cassia, left by Mr. Pettit some time since; and settled his account."

On being informed by the plaintiff, that he was held liable to him for the proceeds of the shipment, per the William Penn, the defendant addressed the following letter to the plaintiff:

" *Gibraltar, October 24, 1825.*

Dear Sir,—I have just received your letter of 12th September, which I hasten to reply to. It would appear by your letter, that Mr. Pettit's agency here was not so full as his own instructions to me gave me to expect. The property which he has brought and consigned to me at various times, has ever been delivered over to me with invoices, in his own name; and I have ever been punctilious in following his instructions, sometimes in remitting to one, sometimes

· [Toland v. Sprague.]

to another, and on which property I was always ready, and at various times did advance sums of money; but how he, Mr. Pettit, appropriated this money, it was not my province to inquire; he might have remitted it to you, or any one else. Here follows the other part of his instructions of the date of the 18th December, which you appear to have overlooked; but which must establish in your mind the nature of Mr. Pettit's transactions here. Had you have consigned your property to me, instead of Mr. Pettit, I should then have been accountable to you; but it cannot be expected that I am to guaranty the conduct of your agent, who always is accountable to you for his conduct. Here follows the extract of his order of, 18th December, 1824: "By your account current, rendered this day, a balance stands against me of five thousand five hundred and seventy-four dollars and thirty-one cents; to meet which, you have in your possession five hundred and fifty barrels of superfine flour, on my account entire, my half interest of three hundred and seventy-two barrels of flour, and invoice of crapes, &c., amounting to two thousand and twenty dollars, one hundred ten-catty boxes gunpowder tea, five hundred bundles cassia, and two cases superior satin Mandarin crape dresses, containing one hundred and one dresses," &c. &c.

This paragraph, I repeat, cannot but convince you that all my advances to Mr. Pettit were on the various property which he placed in my hands for sale. It is very true I corresponded with your good self on the subject of the articles which you entrusted to the management of Mr. Pettit; and it is no less true, I did the same with him, and from time to time promised him account; which I never did to you; and, until his last visit to this, did not close the sales of the articles, when, at his particular request, closed every account before he left this. This explanation, I trust, will prove satisfactory, so much so, that I may continue to enjoy your confidence."

The letter of the plaintiff of Philadelphia, January 4th, 1826, repeats and insists on the liability of the defendant to him; to which the defendant gave the following reply:

" *Gibraltar, February* 10, 1826.

"Dear Sir,—I am this moment in receipt of your letter of 4th ultimo, per Charles, and from your reference to my letter of 18th January, 1825, have looked into the same. That I was aware the property handed over to me by Mr. Pettit did not belong to himself there is no question; but on what terms you and others consigned it

to him, is not for me to inquire. On his arrival, he submitted to me invoices of several shipments, required advances, and gave orders for sales; and on his leaving this, as you may suppose, directed me to correspond with the different shippers by him; which, in my opinion, was very proper, and could not in the faintest degree lessen my claim to the property, on which I had made liberal, yes, more than liberal advances; so much so, that Mr. Pettit is over two thousand dollars my debtor: yet so particularly desirous am I to satisfy your mind, as I am in possession of all the original papers, letters, &c. connected with the business, I have no hesitation in submitting the question to any two respectable merchants here, one to be appointed by you, the other by myself, and to their decision I shall most readily subscribe; or if you are willing to leave the business to me, I will submit *every* paper to two disinterested merchants, and they shall address you on the subject; and the affair shall be settled to our satisfaction.

"Herewith duplicate of my respects of 28th ultimo, since which I have delivered a part of your hyson skin tea, at three and a half rials per pound. This parcel has been sold off, and if no complaints of its quality be made hereafter, I shall be glad."

The bill of exceptions also contained a number of accounts sales of merchandise made by the defendant, by order of Charles Pettit; and accounts current with him, commencing in 1822. The only account which was the subject of notice in the charge of the circuit court, was one dated at Gibraltar, June 30, 1825, of the property of the plaintiff left in the hands of the defendant on the 18th December, 1824. This was an account sales, showing a balance of two thousand five hundred and seventy-eight dollars and eleven cents. The account sales was stated to be:

"Sales of merchandise received 3d November, 1824, ex ship William Penn, William West master, from Philadelphia, by order of Mr. Charles Pettit, for account and risk of the concerned, per Horatio Sprague, Gibraltar. *Gibraltar, June 30, 1825.*"

By the account current between the defendant and Charles Pettit, dated "July 6, 1825," in which credit was given for the nett proceeds of the sales of June 30, 1825, a balance appeared to be due from Charles Pettit to the defendant, of one thousand four hundred and six dollars and —— — cents.

The bill of exceptions contained no other account in which the

sales of the shipment made by the plaintiff by the William Penn were stated; nor did it contain any account rendered by the defendant to the plaintiff, relating thereto.

The circuit court charged the jury:

That there being a plea of the statute of limitation, the plaintiff must by his replication bring himself within the exception concerning merchants' accounts in the said statute, or must fail. To be within the said exception, such accounts must concern trade and merchandise, and must also contain mutual demands, and must be an open and running account, and must be such for which an action of account would lie; and must be between merchant and merchant, their factors or servants, not merely between those who hold their goods under an obligation to account.

Here the plaintiff claimed one thousand five hundred and seventy-nine dollars, the balance of sales of property, as per account sales June 30, 1825, amounting to two thousand five hundred and seventy-nine dollars. Credit by one thousand dollars—Bill on Pearson. The plaintiff and defendant agree in the amount of sales, and no item is objected to.

Thus far the account is a stated one, not being objected to for ten years; if any balance is due, it is ascertained by mutual consent.

There is no mutual account between them, nor an open one, and there can be no new account open between them. The contest does not depend on an account, but on who has a right to a liquidated balance, admitted by defendant to be in his hands as the proceeds of plaintiff's property: plaintiff claims it as his own; the defendant claims to apply it to a debt due by Pettit.

On the pleadings, the question is not who has a right to the money; but whether plaintiff is not barred by the statute.

The plaintiff had not made out a case which exempts him from the statute. If Sprague had rendered the account sales to the plaintiff, and admitted the balance to be payable to him, that would not bring plaintiff within the exception.

The plaintiff had a complete right of action, on demand of a settled balance; and he made this demand in 1825, and the statute would then begin to run. The plaintiff's only claim is for a precise balance; and this would not have been the mutual open account current between merchant and merchant, concerning the trade of merchandise between plaintiff and defendant. It did not become so by defendant claiming to retain the balance for Pettit's debt; nor did it change the

[Toland v. Sprague.]

nature of the transaction, or make the cause more a matter of account, than if he admitted the plaintiff's right to it.

The only question is, who is entitled to the balance of a settled account. Admitting, then, that defendant was the factor of the plaintiff, he has failed in making out his replication as matter of law; it was not a case of trust, not embraced by statute.

Taking the account, then, as one where defendant was factor for plaintiff, bound to account to him and pay him the balance, and having no authority to apply the proceeds to Pettit's debt, and plaintiff not bound by receipt of one thousand dollars: the nature of the transaction does not bring it within the exception, being for a liquidated balance admitted; and by the correspondence between the parties, the controversy brought to a contest for the balance, this can be an exception only on the ground of merchants being privileged characters.

The correspondence between the parties, so long ago as early in the year 1826, shows that the question between them was not about the account, or any item in it, but on the right of Mr. Sprague to retain the admitted balance to repay the advances he made to Pettit: that was the only question in dispute between them; and it is the only one now, and has so continued for more than ten years.

This view makes it unnecessary to consider the other interesting questions as to the powers of agents, factors, supercargoes, pledging, and of sub-agents; the jury are to take the direction of the court in the question, which is a matter of law: and so left the same to the jury.

The case was argued by Mr. Gilpin and Mr. Hare, for the plaintiff in error; and by Mr. Gerhard, with whom was Coxe, for the defendant.

For the plaintiff, the following errors were assigned:

1. That the court charged the jury upon an issue which not only did not appear upon, but was excluded by the pleadings; upon which the cause was not tried; and which was not raised by any of the counsel in argument.

2 That whether any demand for an account had ever been made, by plaintiff upon defendant; whether any account had ever been rendered by defendant to plaintiff; and whether any account was an account stated between plaintiff and defendant, were all questions for

[*Toland v. Sprague.*]

the jury; and that the court erred in withdrawing the same from the jury, and giving them a positive direction thereon.

3. That supposing the questions set forth in the foregoing error assigned to be for the court, the court erred in charging the jury that, in point of law, there was any demand made on defendant by plaintiff for an account: that the defendant had ever rendered an account to the plaintiff; and that there was an account stated between the plaintiff and the defendant, so as to deprive the plaintiff of the benefit of the exception in the statute of limitations concerning merchants' accounts.

4. Because the charge of the court was against the law and the evidence.

Mr. Hare, for the plaintiff in error:

The defendant in error objects to this Court's jurisdiction, as well as to that of the court below, on the ground that he is within the 11th section of the judiciary act of 1789, which enacts, that "no civil suit shall be brought in the circuit courts against an *inhabitant* of the United States, by any original process, in any other district than that whereof he is an *inhabitant,* or in which he shall be found at the time of serving the writ."

This question was raised in the court below, by means of a rule to show cause why the writ should not be quashed, and decided against the defendant after argument, and on affidavits, showing that the defendant was a citizen of Massachusetts, and had been for more than twenty years an inhabitant of Gibraltar.

We contend: 1. That the matter of such a defence, as it ousts the court below, or this Court of its jurisdiction, by reason of a personal privilege, must be duly pleaded; and if waived in the order of pleading, is lost.

2. That the defendant, not being an inhabitant of the United States, but residing in another country, is, therefore, not within the 11th section, and is liable to foreign attachment.

As to the first point, the 11th section confers a personal privilege which, like all other personal exemptions, must be pleaded; because his right to it is examinable, and nothing appears on the record to found a doubt of the jurisdiction. And as it is a personal privilege, it may be waived, in which case the court has jurisdiction. As it is merely dilatory, it is not to be favoured. Harrison v. Rowan, 1 Peters' C. C. R. 489; Kitchen v. Williamson, 4 Wash. C. C. R. 85;

Logan v. Patrick, 5, Cranch, 288.    And having pleaded in bar, he cannot now raise the question of his privilege in this Court.

2d.  It appeared, upon affidavit in the court below, that the defendant is not an inhabitant of the United States, has not been such for twenty years, but is domiciled in Gibraltar.   He is not, therefore, within the words or meaning of the 11th section; which covers none but inhabitants of the United States

The judiciary act gives to the circuit court cognizance of all suits, of a civil nature, between citizens of different states; which is the case of the parties to this action; or citizen and alien.    And the act to regulate processes, gives to the same courts the same processes as are used in the state courts of the particular district.

The process in this case was a foreign attachment, which is used in the state courts of Pennsylvania.  The 11th section restrains the service of process upon an inhabitant of the United States, except in his own district, or in that where he is at the time of writ served.

Where a general power is given, and a particular restriction afterwards imposed, the restriction must be construed strictly, or it may override the power.

Here the character of the process and that of the suit are within both acts.   The question, then, is on the restriction: but the defendant is not an inhabitant of the United States, and therefore not within it.

The spirit of the restriction was to save inhabitants of the United States, whether citizens or aliens, from a greater hardship than either would be subjected to in the state courts; that, namely, of being called to answer in a distant tribunal, by virtue of the general power of the federal courts, as extending all over the Union.    But this consideration cannot apply to the case of foreign attachment against a non-resident, since that process is used in the state courts; and would have lain against this defendant, and cannot lie against an inhabitant of the state or district.   If the attachment had issued from the state courts, the defendant might have transferred it to the circuit court by the terms of 12th section of the judiciary act.   3 Harr. & M'Hen. 556, 557.

It has been the practice in Pennsylvania to issue foreign attachments from the circuit courts against aliens non-resident.

The word *inhabitant* in the act does not mean *citizen*.   If so, aliens resident would be exposed to a hardship from which citizens are exempted.   The argument for the defendant must mean that,

[Toland v. Sprague.]

because the defendant is a citizen of Massachusetts, he is therefore an inhabitant of the United States; that is, that inhabitant and citizen are the same thing. In some cases, it is true, the *residence* of a citizen of the United States within the United States, determines of what state he is a citizen, as to the question of jurisdiction of the United States' courts: as in Cooper v. Galbraith, 3 Wash. 553; Buller v. Farnworth, 4 Wash. 101. But in this case, the citizen of the United States is an inhabitant of another country. He is not thereby divested of his citizenship; which signifies his political relations, and does not depend on his will. 2 Cranch, 318; United States v. Gillies, 1 Peters' C. C. R. 161; 4 Tuck. Blackst. 101; 4 Am. Law Journal, 462; 2 Cranch, 120; 8 T. R. 45; Hale's Com. Law, 184; Vattel, 162, 318. But he is not an inhabitant of the United States; he is such of another country: and he is to be dealt with as such in a question of jurisdiction in this Court. 2 Peters, 450; 2 Rob. Adm. Rep. 267; 3 Rob. Adm. Rep. 23; 2 Bos. & Pul. 229; 1 Binn. 351. And if foreign attachment will lie against an alien non-resident of this country, there is no reason why it should not lie against a citizen non-resident.

If pleaded, that he was an inhabitant of the United States, and issue had been joined, the verdict must have been that he was not an inhabitant: and if so found, there is nothing to take away the jurisdiction of the circuit court.

The first error is, that the court charged upon an issue not only not appearing upon, but concluded by the pleadings.

The charge of the court assumes that there had been an account stated between the plaintiff and defendant. None was alleged at the trial. The action was for the proceeds of a shipment placed in the hands of the defendant, by the plaintiff's agent. The merits were not noticed in the charge of the court, and are therefore not material. The statute of limitations was not relied on by the counsel for the defendant, at the trial. The cause was tried upon the issues, and we contend the charge was upon what was not in issue.

The declaration contains two counts; for money had and received, and for not rendering an account. There was originally a third count, viz., on an account stated; which was struck out before replication, upon a rule granted by the court. The defendant pleaded non assumpsit, and the statute of limitations; which, in Pennsylvania, by a defect of legislation, does not save the right of the plaintiff against an absent defendant.

[Toland v. Sprague.]

The plaintiff took issue on the first plea; and to the second, replied, the exception in the statute concerning merchants' accounts; and alleged in it that no account had ever been rendered or stated between the parties. Godfrey v. Saunders, 1 Wils. 79; 1 Burrows, 317, 557; 558; 9 Serg. and Rawle, 293.. It being a construction of this exception that it does not include accounts stated, it was proper to allege they were not stated.

The defendant rejoined that plaintiff and defendant were not merchants, &c. It admitted, therefore, there was no account stated, as it did not deny it: for, whatever is traversable, and not traversed, is admitted; 2 Starkie's Rep. 62; Stephen on Pleading, 255, 258; Appendix, 44, 54. The verdict, if stated at large on the record, would have been that the parties were merchants, which, as a fact, was not doubted. If stated at large, " under the direction of the court," as expressed in the record to have been found it must have been that there was an account stated between the parties. But it is a rule that a verdict cannot contradict the issue nor admissions in the pleadings. 5 Bac. Abr. 322; 2 Mod. 5; 2 Ld. Raym. 864. The learned judge, therefore, clearly erred when he charged the jury that the question in the pleadings, was, whether an account had or had not been stated; since such a verdict would have been a nullity.

Upon the issue, the plaintiff proved the amount owing to him by the written admission of the defendant, which admission did not include the right of the plaintiff to that amount. If the rejoinder had been that there was an account stated, his course would have been different, and it would have lain on the defendant to prove such an account; which attempt, if it failed, would have destroyed his defence on the merits.

The second error assigned is, that the court took away from the jury the question, whether there was or was not an account stated; and charged positively that a particular paper was not such.

The replication denied an account stated; the rejoinder admitted there was none; and none was alleged or produced in evidence. The plaintiff was entitled to be heard against the construction of any paper, as such account. The court charged that the account sales of June 30th, 1825, was an account stated between the parties; and did not state that that account was not sent by defendant to plaintiff, but was given by defendant to Pettit, who was not then the plaintiff's agent; that the defendant always denied his liability to account to the plain-

tiff; and affected to treat Pettit as the owner of the goods; and that the account was given by Pettit to the plaintiff, as showing what disposition he had made of the goods. We contend that this was not an account stated, in point of fact; and that the jury were the judges of the character of the paper: for it was not a question of the construction of a paper, nor of the meaning of a phrase: but of a fact, whether this paper was sent, and received as an account stated; and it was a matter of argument to the jury, whether an account sales can be, in any case, an account stated, inasmuch as it shows no balance between the parties: and whether the refusal of the defendant to account, and his allegation that he had never intended to account with plaintiff, did not destroy the character which the court gave to this paper as an account stated.

The third error assigned is, that the court assumed and charged that there was an account stated between the parties.

Supposing that the issue had been on the allegation that no account was stated, and that the decision of any paper produced as such, belonged to the court—We contend that nothing was produced in evidence, which deserved that character in law or fact; so as to bar the plaintiff of the exception in the statute of limitations concerning merchants' accounts.

What are alleged as constituting the account stated, are a demand by the plaintiff on defendant, for a specific sum, which he had incidentally learned from a third person, was the proceeds of his goods; and the account sales which contained that amount.

We agree, that if accounts between merchants are stated, they are within the statute. 1 Ventr. 89; Ibid. 865; 1 Mod. 269; and cases referred to in Wilkinson on Limit. 30, et seq.; Blanchard on Limit. 88, et seq. And further, that in accounts between others than merchants, or since Spring v. Craig's Exr's., 6 Peters, 151; 6 Term Rep. 193; if between merchants, and not concerning the traffic of merchants, to bar the statute, an item must be within six years.

We contend that open accounts between merchants, are within the exception; and further, that accounts closed by cessation of dealings, are open accounts; but the pleadings must state accounts to be open. 1 Saunders' Rep. 127; 6 Term Rep. 193; 5 Cranch, 15; 2 Dall. 254; 2 Yeates, 105; 5 Johns. C. R. 526; 19 Ves. 180; Blanchard on Limit. 89.

The accounts must consist of more than one item, and of more

[Toland y. Sprague.]

than one transaction; and must, in general, contain mutual credits; but not as between merchant and factor: for there the course of trade may be, that the factor has only to receive and dispose o the goods, and remit their proceeds.   Between a merchant and his factor, there can be no reciprocal demands in buying and selling, such as exist between merchant and merchant.   A stated account is a clear statement of accounts, justified by signatures, as exhibiting approbation. 2 Young on Invoices, 37; none such is pretended.   An account current may become an account stated, by the silence of the party receiving it.   2 Vern. 76; 2 Ves. sen., 239.   But as soon as the plaintiff here learned that the defendant had sold his goods, he demanded the proceeds.   The defendant refused them, claiming to be entitled to them; he refused to acknowledge the plaintiff as owner, or to account with him: he did not send him account sales: he made up, three years after this transaction, an account which contained no item of it: and he admits in the pleadings, and on the trial, that he never has stated an account with him.   If an account had never been stated, it is impossible to say that the plaintiff did not object to it.   He claimed an amount which he learned was the proceeds of his goods; the defendant retained it, and the plaintiff objected to his retaining it.  He could not do more.   The court therefore erred, in saying that the account had been unobjected to for ten years; and erred equally in saying that it was for the plaintiff to make out his replication that no account had been stated : an allegation, which, if admitted, (as it was,) was beyond dispute; and if denied, put the burthen on the defendant, the plaintiff asserting a negative, the defendant an affirmative.   No account stated was or is pretended on behalf of the defendant.   None was alleged or produced.  Nor, under the pleadings, was any admissible in evidence.   The fact that the plaintiff had in his possession the account sales of his goods, did not conclude him from asserting his right to the proceeds; even if it concluded him from disputing the amount.   It was, in any sense, no more than accidental knowledge; and not being communicated to him by the defendant, cannot be said to constitute an account stated, between the plaintiff and defendant.

Mr. Gerhard for the defendant :

It becomes the duty of the counsel for the defendant in error, not only to maintain that the errors assigned by the plaintiff cannot be sustained, but further to show that if the plaintiff could prove him-

·[Toland v. Sprague.]

self entitled to a reversal of the judgment of the circuit court, that, from a want of jurisdiction, this Court ought not to award a *venire de novo.* Bingham v. Cabot, 3 Dall. 19; Ketland v. The Cassius, 2 Dall. 368. The circuit court had no jurisdiction of this cause, because:

1. The circuit courts of the United States have no jurisdiction out of their respective districts; and hence no foreign attachment will lie in a circuit court of the United States.

2. The judiciary act of 1789, in express terms, forbids the exercise of jurisdiction assumed in this case by the circuit court.

1st. The circuit courts of the United States have no jurisdiction of actions of foreign attachment.

An action of foreign attachment is in direct contravention of the principles of the common law; and in every state in which the action will lie, it depends for its shape and character and proceedings upon the statutes of that state. Hereafter it will be necessary to notice, more particularly, the Pennsylvania action of foreign attachment. It is sufficient at present to say, that in Pennsylvania it is a mode of commencing actions against a debtor, who is not a resident of the state; nor at the time the attachment issued within the bounds of the state. Serg. on Attach. 55, 61. Now, certainly it would seem, until congress shall give the federal courts power to exercise jurisdiction over persons out of the districts to which their jurisdictions are respectively confined by their very constitutions, that no state law like this can be recognised in a federal court; and such is the deliberate opinion of one of the judges of this Court. Piquet v. Swan, 5 Mason, 39, 41, 48, 50. 2 Dall. 396. If this position be correct, then the case must be dismissed; for the record shows the nature of the action and of the service of the writ: and the laws of Pennsylvania which are of judicial cognizance, prove that the defendant could not have been within the state at the time of the service of the process, even if the return of the marshal had been less explicit.

2dly. The judiciary act of 1789, in express terms, forbids the exercise of jurisdiction assumed in this case by the circuit court. Section eleventh, points out the jurisdiction of the circuit courts of the United States, and then proceeds: "But no person shall be arrested in one district for trial in another, in any civil action, before a circuit or district court. And no civil suit shall be brought before either of said courts against an inhabitant of the United States, by any origi-

[Toland v. Sprague.]

nal process in any other district, than that whereof he is an inhabit-ant, or in which he shall be found at the time of serving the writ."

As it has been decided by this Court, that this provision merely confers a personal privilege on a defendant, which he may waive; it will be my effort to show; first, that the defendant has not waived his privilege, if he have any; and, secondly, that the defendant is entitled to the privilege secured by this provision; that this suit violates that privilege; and that the record shows both the privilege and the violation.

1. The defendant has not waived his privilege, if he have any.

To maintain this, it will be necessary to examine into the nature of the Pennsylvania action of foreign attachment; and this will be done as briefly as possible. As has been already stated, it is a mode of commencing actions against a debtor who is not a resident of the state, nor, at the time the attachment issued, within the bounds of the state. Serg. on Attach. 55, 61.

The defendant in the attachment cannot put in any defence, un-less he appears and gives bail to the action, and submits his person by so doing to the jurisdiction of the court. Serg. on Attach. 131. Otherwise the court will give judgment against him by default, at the third term after the attachment has been issued; and the plaintiff may proceed by scire facias against the garnishee, to apply the goods attached to the payment of his the plaintiff's claim. Serg. on Attach. 21.

But if there be any irregularity in the attachment, as if the defend-ant be not the subject of an attachment, for instance, if he be within the bounds of the state; the proper mode of taking advantage of such irregularity, is by making a summary application to the court, to quash the attachment. By entering the bail to the action, the only terms upon which he is allowed to plead, he waives the irregularity. Serg. on Attach. 139.

As soon as the defendant could, he made such an application to the circuit court. The affidavit shows, accurately, the nature of the application. The point was argued; and after considerable hesita-tion, the court decided that they would sustain the writ, though the defendant was described in it, &c. as a citizen of Massachusetts. What then could the defendant do? An appearance in the court below, after that decision, was all that remained to him; but as the ap-pearance was an enforced one, there is no case which decides that he cannot now claim the benefit of the privilege, if he was entitled to

[Toland v. Sprague.]

it originally; and surely there is no principle which would produce that effect. Harrison v. Rowan, 1 Pet. C. C. R. 489, is entirely up to this point: and shows that nothing but a *voluntary* appearance waives the privilege of a defendant, not to be sued out of his own district. There the court go further and say, that you may appear in order to plead your privilege; but they are far from saying that you *must* so take advantage of this right: and a careful consideration of the nature of a foreign attachment will show, that whatever might be the case as to a suit in equity, a defendant in a foreign attachment is *not*, at all events, *bound* to plead the privilege in question; and it would seem to be a necessary consequence, that after the failure of a summary application in the court below to quash the writ for this reason, that the application may be renewed in the Supreme Court; since the ground of the application appears upon the record.

2dly. But is the defendant entitled to the privilege secured by the section of the act in question; does this suit violate that privilege; and does the record show both the privilege and the violation? If the defendant be an inhabitant of the United States, he clearly has the privilege.

1. Either the word "inhabitant" means any one who is liable to the process of the United States' courts. Picquet v. Swan, 5 Mason, 55, R.: or,

2. It means an inhabitant of one of the United States, i. e. a citizen of one of the United States.

Now the word in question must be defined in one of these modes, for otherwise it would embrace cases over which the United States' courts have clearly no jurisdiction. Hepburn v. Ellzey, 2 Cr. 445; Corporation of New Orleans v. Winter, 1 Wheat. 91; Picquet v. Swan, 5 Mason, 50, 54, 55; Rabaud v. D'Wolf, 1 Paine, 580.

The first definition is the more natural; for it seems obvious that every case was intended to be provided for; and this construction is supported by high authority.

But if the first be incorrect, then the second definition must be adopted; otherwise, the phrase "inhabitant of the United States," would embrace the case of a citizen of the United States, not a citizen of *one* of the United *States:* which, as we have seen, are not within the jurisdiction of the federal courts. The literal meaning of the words in question undoubtedly favour this construction of them.

Either definition will, however, be fatal to the plaintiff's case; the first will be clearly so; and I proceed to show that the second

will be no less availing to the defendant. It has been repeatedly decided, that where the jurisdiction of the courts of the United States depends upon the character of the parties to the suit, that character must appear upon the record: and that averment is one which the plaintiff must prove. Catlett v. Pacific Ins. Co. 1 Paine, 594; Wood v. Mann, 1 Sumner, 581. The character of the parties is here the only foundation of jurisdiction; and the plaintiff averred that the defendant was a citizen of Massachusetts. This appears in the *præcipe* for the writ; in the writ; and in all the subsequent proceedings; and the only foundation of the jurisdiction of the circuit court in this case is, that the defendant was, at the time of the commencement of this action, a citizen of Massachusetts. What is the meaning of the word citizen in our jurisprudence? Citizenship, when spoken of in the constitution, means nothing more than residence. Cooper's Lessee v. Galbraith, 3 Wash. C. C. R. 546; Knox v. Greenleaf, 4 Dall. 360. "A citizen who is domiciled in the enemy's country, as to his capacity to sue is deemed an alien enemy." Society, &c. v. Wheeler, 2 Gallis. 130.

The word "inhabitant," in the act, is obviously synonymous with "citizen," 5 Mason 39. See, also, Prentiss v. Barton, 1 Brockenb. 389. "Inhabitant," is defined by philologists almost by the same words as those employed by the federal court in their definitions of "citizenship," of a state. Crabb's Syn. verb, "to inhabit;" Johnson's Dict.; Webster's Dict., words "inhabit," and "inhabitant."

The plaintiff, then, cannot show that the defendant was not an inhabitant of Massachusetts, without contradicting the record; and this he certainly cannot be permitted to do.

These principles only conduct us to the same result as the authorities, for it has been decided by two of the circuit courts of the United States, "that an action of foreign attachment will not lie in a circuit court against a citizen of the United States. Hollingsworth v. Adams, 2 Dall. 396; Picquet v. Swan, 5 Mason, 39.

Admitting, however, that the plaintiff is not estopped from showing the defendant's residence to be elsewhere than in Massachusetts, what evidence did he bring to the contrary? Now will any one contend that a citizen of the United States loses his domicil by an absence abroad in the service of his country? If not, then the defendant's domicil, even according to the plaintiff's affidavit, is still in Massachusetts; and if reference is made to the case of Lazarus v. Bar-

nett, 1 Dall. 153, it will be found, it is believed, that under these circumstances, had the defendant been domiciled in Pennsylvania before he left the United States, the action could not have been maintained against him in a court of the state of Pennsylvania. For residence abroad is only prima facie evidence of domicil. Johnson v. Sundry Articles of Merchandise, 6 Hall's Am. Law. Journ. 85.

But if the plaintiff can be supposed to have attained his object, and to have shown by the evidence which he adduced for the purpose, that the domicil of the defendant was in Gibraltar, at the time of the institution of this suit; he effectually deprives the courts of the United States of all jurisdiction over the case: since he would then be a citizen of the United States but not a citizen of *one* of the United *States*.

To conclude the argument on this point, the record shows that the defendant was, at the time of the commencement of this action, a citizen of Massachusetts; the laws which govern the action of foreign attachment, and make it necessary that the defendant should be absent from the state, are judicially cognizable; and besides, the return of the writ shows that the defendant was not served with the process in the state of Pennsylvania. The defendant was forced, by the attachment of his funds, and the decision of the court on the summary application, to appear to the action by entering special bail. The error is therefore apparent to this Court, and the defendant has not waived his privilege. Should the Court have any doubt about the nature and grounds of the defendant's application to quash the attachment; he should be permitted to show to this Court, that his appearance was an involuntary one. This was the course pursued in Harrison v. Rowan, 1 Peters' C. C. Rep. 489: but had the record been fully certified, there could have been no difficulty upon this subject. If, on the other hand, the defendant was not an inhabitant of Massachusetts, then he was a citizen of the United States, but not a citizen of one of the United States, and the circuit court never had or can have jurisdiction of the cause.

There were two issues tried by the same jury, viz. one an issue on the plea of non assumpsit; and the other on the plea of the statute of limitations. Both were found for the defendant, " under the direction of the court."

It is complained that there was error in the charge of the judge upon the issue of the statute of limitations. If it should be granted, for the sake of argument, that there was, yet how does this affect the

[Toland v. Sprague.]

plaintiff? Even if a verdict had been found for him, judgment must have been given for the defendant, on the finding of the jury on the other issue. There is no error suggested in the judge's directions to the jury, under the general issue; for the statute of limitations could not have been given in evidence under the general issue, and any charge of the court upon the effect of the statute, was, of course, inapplicable to that issue. The error, therefore, if it were material, has become immaterial by the finding of the jury on the other issue. No court reverses for immaterial errors. If this Court should reverse the judgment in this case, what will they do with the verdict on the general issue? Will they grant a venire de novo, as to that also, when no error as to it is suggested? It is true, the jury have added a clause to the verdict; from which it appears that they found for the defendant, "under the direction of the court." But this is no part of the verdict; it is mere surplusage; and it has no legal effect. Nor does it appear that they allude to the supposed erroneous part of the judge's charge.

The defendant, however, denies that there is any error in the judge's charge. It has been urged, but it cannot be seriously contended, that the judge's charge was in itself erroneous. The only point which can be really pressed is, that the charge was erroneous in reference to the issue as to the statute of limitations actually under trial; and it is said that the only point put in issue by the rejoinder was, whether the plaintiff and defendant stood in the relation of merchant and factor; and that the rejoinder admitted, that no account had been settled by passing that allegation in the replication and taking issue upon the existence of the relation of merchant and factor.

Is this so? The plaintiff, in his replication, not only states that the action was founded upon accounts between merchant and factor, but also, that no account had been stated or settled between the parties; and the whole of this matter was necessary to constitute a good reply to the defendant's plea. 5 Cranch, 15; 2 Cond. Rep. 175; Spring v. Gray, 6 Peters, 151; Stiles v. Donaldson, 2 Dall. 264. If, then, that was a single proposition of defence, when we denied that "those sums of money became payable in trade had between merchant and merchant and factor, &c., in manner and form, &c." as the replication alleged, we denied the whole proposition of defence; and the question whether an account had been settled, immediately arose, and was passed upon by the jury. If this was not the case, the issue

upon the statute of limitations was an immaterial one.  If the defendant was the factor of the plaintiff, then the account rendered to Pettit is an account stated.  Both admit the foot of that account to be the amount in controversy.

Mr. Gilpin, for the plaintiff:

The facts involved are few, and not disputed.  In September, 1824, Henry Toland, a citizen of Pennsylvania, shipped certain tobacco and teas, in the William Penn, bound to Gibraltar.  They were consigned to Pettit, the supercargo.  Part were sold there by him, and one thousand dollars of the proceeds remitted to Toland.  When Pettit left Gibraltar, in December, he placed the remainder of these goods, with those of other persons, in the hands of Horatio Sprague, a citizen of Massachusetts, then; and still resident in Gibraltar; with instructions to sell them and account therefor to Toland.  He corresponded with the latter accordingly, up to the following June; when, on a settlement made between Pettit and Sprague, at Gibraltar, of their own affairs, it appeared that the former was largely indebted to the latter: who, thereupon, passed the proceeds of the goods, amounting to one thousand five hundred and seventy-nine dollars and eleven cents, to Pettit's credit in their account, and so wrote to Toland.  No account was furnished to the latter; but in the month of September, 1825, he saw, in the possession of Pettit, a general account of sales from Sprague, in which this item was embraced, and he thereupon demanded payment of it from Sprague.  This was refused; and though the commercial dealings and accounts between them continued for several years, payment of this sum never was obtained.  In August, 1834, finding some property of Sprague, in Pennsylvania, the plaintiff, Toland, commenced a suit, by foreign attachment, in the circuit court of the United States for that district.

It is now objected that the court had no jurisdiction of such suit; and this objection amounts to a denial of the right of proceeding in the circuit courts of the United States, by "foreign attachment."  If this be so, it is scarcely possible that on a point which must have so often arisen, we can be without an express judicial decision to that effect.  Yet none such has been produced.  Two cases are relied on; but neither of them turns upon this point, or resembles, in its circumstances, that now before the Court.  In the case of Picquet v. Swan, 5 Mason, 38, the defendant was described, not as a citizen of

[Toland v. Sprague.]

a different state from the plaintiff, but as "a citizen of the United States:" a defect which Judge Story declared to be fatal. Again, the service of the summons was clearly "defective and nugatory." In the case of Richmond v. Dreyfous, 1 Sumner, 131, it appeared that the defendant was a resident and inhabitant of another state, at the time the suit was brought; and of course exempted by the express provision of the judiciary act. But while no decisions can be produced against this mode of proceeding, in a similar case; there are several instances in which it has been adopted and allowed. Fisher v. Consequa, 2 Wash. 382; Graighle v. Nottnagle, 1 Peters' C. C. Rep. 255; Pollard v. Dwight, 4 Cranch, 421.

The law would seem to be very clear. By the act of 29th September, 1789, sec. 2, a plaintiff in the circuit court is entitled to "all such forms of writs and modes of process" as are "used or allowed in each state respectively;" and it is not denied that this form of writ, and mode of process, is used and allowed in Pennsylvania. We admit that this law is controlled by the act of 24th September, 1789, which describes the persons who may, and who may not be sued. By that law, the suit must be "between a citizen of the state where the suit is brought and a citizen of another state:" a fact which appears in this case in all the pleadings. There is a proviso, however, that "no civil suit can be brought against an inhabitant of the United States, in any other district than that whereof he is an inhabitant." It is not denied that if the defendant, Sprague, was an inhabitant of any other state, this proceeding would not lie; but it is proved he is not: it is admitted that he has long been an inhabitant of Gibraltar. It is attempted to blend together citizenship and inhabitancy. The act of congress did not mean this; it grants a personal privilege to the inhabitants of every state, whether they be citizens or aliens: it gives to every person actually resident in any state, the privilege of being sued there, and exempts him from being dragged away to a distant tribunal: the defendant is no such resident, and consequently the law did not mean to give him any such privilege.

But, even had he been entitled to that privilege when the suit was brought, it is now too late to avail himself of it. He has pleaded in bar to the action, which is a waiver of his personal privilege. Had he pleaded in abatement, the point would have come up for the judgment of the court. By neglecting to do so, he has waived it. Harrison v. Rowan, 1 Peters' C. C. R. 491; Pollard v. Dwight, 4 Cranch, 421; Logan v. Patrick, 5 Cranch, 288; Picquet v. Swan, 5 Mason,

43. The motion to quash was a summary proceeding, on which error will not lie. If the defendant intended to avail himself of an alleged error of the court in that decision, he should have then permitted judgment to go by default; or have pleaded in abatement, so that there might have been a judgment on the point. He has pleaded over to the action, and it is now too late to avail himself of the error, if it were one.

But suppose it was error in the circuit court to refuse this privilege even on a summary motion; still, by the record now before this Court, it does not appear that they did so. The record merely sets forth a general "motion to quash the attachment;" and, as general, a "refusal" by the court: the grounds either of the one or the other do not appear.

Passing, then, this preliminary point of the jurisdiction of the circuit court, we come to the charge of the court, in which the plaintiff contends there is manifest error.

It is necessary to examine the pleadings carefully. This is an action of assumpsit. The defendant pleads first, non-assumpsit; second, the statute of limitations. The plaintiff joins issue on the first; and replies to the second, that he is not barred by the statute of limitations because "the sum claimed became due in trade between them as merchants, and merchant and factor, and that no account was ever stated or settled between them." The defendant rejoins only, that "the sum claimed did not become due in trade between them as merchants and merchant and factor." The plaintiff joins issue. Here then are two issues, both tendered by the defendant: and they are first, non-assumpsit; second, were the dealings between the parties those of merchants? No other points are left open by the pleadings. The whole intention of pleading is to ascertain exactly the point in controversy; the issue tendered is the notice of this point given by one party to the other. Accordingly, on the trial, (as the receipt of the money was admitted, and the assumpsit thus proved,) the whole evidence and argument were confined to the point, whether or not "the dealings between the parties were those of merchants, and merchant and factor." When the court came to charge the jury, they excluded, expressly, from their consideration all the evidence as to the facts involved in this point, and all the arguments upon it: and they instructed them that the case was to be decided upon another point; namely, that where there was a settled and stated account for more than six years, it barred the plaintiff's claim: that the account of 4th

July 1825, from Sprague to Pettit was such a one; and that the jury must so find, as the question was one of law, not of fact. The verdict was so found accordingly, " under the direction of the court."

To this charge, we have three exceptions:

I. The court charged on the issue, "whether or not there was a settled and stated account between these parties;" and in so doing they erred.

1. Because the parties themselves never made such an issue in their own pleadings. The plaintiff in his replication had expressly tendered that point to the defendant, but he had not accepted it.

2. Not only was that point not made by the pleadings, but it was excluded by them; for if there was an account settled and stated, it showed a balance due to the plaintiff for more than six years, yet the defendant denies any such balance at any time. Again, it is excluded because it was traversable matter presented, totidem verbis, in the replication; and it is a settled rule of pleading, that "every material fact alleged must be traversed;" Larned v. Bruce, 6 Mass. 57: and that "where traversable matter is not traversed, it is confessed." Nicholson v. Simpson, Strange, 297. The allegation made by the plaintiff in his replication, that there was no account stated, not being traversed, was thus confessed; and therefore excluded from the consideration of the jury, or the court.

3. Nor was the case either argued or tried upon this point.

It was therefore error in the court to charge on it. They had no right to put to the jury that which was concluded by the pleadings; as well might the court on a plea of payment in an action of debt on a bond, instruct the jury to find that it was, or was not the deed of the defendant.

II. But suppose the question whether there was a settled account be not concluded by the pleadings; be still open to the jury; yet this was a matter of fact. Various considerations are involved in it; it is not "a construction of written papers;" the very plea and issue show it was for a jury: there was a complicated account between Sprague and Pettit, a third person; the extent to which Toland, the plaintiff, was connected with each of them, was an essential element. The court, in their charge, took entirely from the jury all consideration of these matters, and decided the point as entirely one of law. In this there was error.

III. To come, however, to the main inquiry. We contend that there never was, in fact, an account stated and sett' d, so as to de-

prive the plaintiff of the benefit of that exception in the statute of limitations, which exists in favour of merchants. If we establish this, as the court has charged there is such a stated and settled account, we establish a manifest error.

According to the evidence in the case, the defendant, Sprague, was the factor of Toland, the plaintiff; and corresponded with him as such, from December, 1824, to July, 1825. He was also, during the same period, engaged in trade with Pettit. In the latter month, he made up an account *sales* between himself and Pettit, and sent it, not to the plaintiff, but to Pettit; in whose hands the plaintiff saw it, and found it embraced some of his property; and this he demanded of him. The dealings between the plaintiff and defendant continued open for several years: Sprague always explicitly refused to state or settle an account between himself and Toland, for any item in the account sales rendered to Pettit, and denied that the former had any thing to do with it. Yet on these facts, it is contended that there was a stated and settled account between Toland and Sprague. What is a "stated account?" Lord Hardwicke describes it. It is an account current, sent by one merchant to another, in which a balance is due from one to the other. Tickel v. Short, 2 Vesey, 239. If the receiver holds it for a certain time without objection, it becomes a stated account. It must be an account, that is, a settlement of their transactions by the parties; it must be between themselves; it must preclude both parties. But how is this account between Pettit and Sprague a settlement between the latter and Toland? Would Sprague be precluded from any claim against Toland, because he had omitted to state it in such an account with a third person? It is no settlement, no statement of an account; and consequently no bar.

In addition to these exceptions to the charge of the court, it remains to make a single remark on a point presented by the defendant, as a reason why the writ of error should be dismissed: that " there were two pleas pleaded, the one being the general issue, and no averment in the record, that in this verdict and judgment on this plea, there was error." In reply, the judgment is entered on the verdict, and that is expressly stated to be under the direction of the court, whose charge was confined to the question of the statute of limitations. But in truth, this is not material; for it is sufficient to show manifest error on any point in the charge of the court.

Mr. Justice BARBOUR delivered the opinion of the Court:

This is a writ of error to a judgment of the circuit court of the United States for the district of Pennsylvania.

The suit was commenced by the plaintiff in error against the defendant in error, by a process known in Pennsylvania by the name of a foreign attachment; by which, according to the laws of that state, a debtor who is not an inhabitant of the commonwealth, is liable to be attached by his property found therein, to appear and answer a suit brought against him by a creditor.

It appears upon the record, that the plaintiff is a citizen of Pennsylvania; and the defendant a citizen of Massachusetts, but domiciled, at the time of the institution of the suit, and for some years before, without the limits of the United States, to wit, at Gibraltar; and when the attachment was levied upon his property, not being found within the district of Pennsylvania.

Upon the return of the attachment, executed on certain garnishees holding property of, or being indebted to the defendant; he, by his attorney, obtained a rule to show cause why the attachment should not be quashed, which rule was afterwards discharged by the court; after which the defendant appeared and pleaded. Issues were made up between the parties, on which they went to trial; when a verdict and judgment were rendered in favour of the defendant. At the trial, a bill of exceptions was taken by the plaintiff, stating the evidence at large, and the charge given by the court to the jury; which will hereafter be particularly noticed when we come to consider the merits of the case. But before we do so, there are some preliminary questions arising in the case, which it is proper for us to dispose of.

And the first is, whether the process of foreign attachment can be properly used by the circuit courts of the United States, in cases where the defendant is domiciled abroad, and not found within the district in which the process issues, so that it can be served upon him?

The answer to this question must be found in the construction of the 11th section of the judiciary act of 1789, as influenced by the true principles of interpretation; and by the course of legislation on the subject.

That section, as far as relates to this question, gives to the circuit courts original cognizance, concurrent with the courts of the several states, of all suits of a civil nature, at common law or in equity, where

the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars, and an alien is a party; or the suit is between a citizen of the state where the suit is brought, and a citizen of another state.   It then provides, that no person shall be arrested in one district for trial in another, in any civil action before a circuit or district court; and moreover, that no civil suit shall be brought before either of said courts against an inhabitant of the United States, by any original process, in any other district than that whereof he is an inhabitant, or in which he shall be found at the time of serving the writ.   As it respects persons who are inhabitants, or who are found in a particular district, the language is too explicit to admit of doubt. The difficulty is, in giving a construction to the section in relation to those who are *not inhabitants* and *not found* in the district.

This question was elaborately argued by the circuit court of Massachusetts, in the case of Picquet v. Swan, reported in 5th Mason, 35.

Referring to the reasoning in that case, generally, as having great force, we shall content ourselves with stating the substance of it in a condensed form, in which we concur.   Although the process acts of 1789 and 1792 have adopted the forms of writs and modes of process in the several states, they can have no effect where they contravene the legislation of congress.   The state laws can confer no authority on this court, in the exercise of its jurisdiction, by the use of state process, to reach either persons or property; which it could not reach within the meaning of the law creating it.   The judiciary act has divided the United States into judicial districts.   Within these districts, a circuit court is required to be holden.   The circuit court of each district sits within and for that district; and is bounded by its local limits.   Whatever may be the extent of their jurisdiction over the subject matter of suits, in respect to persons and property; it can only be exercised within the limits of the district.   Congress might have authorized civil process from any circuit court, to have run into any state of the Union.   It has not done so.   It has not in terms authorized any original civil process to run into any other district; with the single exception of subpœnas for witnesses, within a limited distance.   In regard to final process, there are two cases, and two only, in which writs of execution can now by law be served in any other district than that in which the judgment was rendered; one in favour of private persons, in another district of the same state, and the other in favour of the United States, in any part of

[Toland v. Sprague.]

the United States. We think that the opinion of the legislature is thus manifested to be, that the process of a circuit court cannot be served without the district in which it is established; without the special authority of law therefor.

If such be the inference from the course of legislation, the same interpretation is alike sustained by considerations of reason and justice. Nothing can be more unjust, than that a person should have his rights passed upon, and finally decided by a tribunal; without some process being served upon him, by which he will have notice, which will enable him to appear and defend himself. This principle is strongly laid down in Buchanan v. Rucker, 9 East, 192. Now, it is not even contended that the circuit courts could proceed to judgment against a person who was domiciled without the United. States, and not found within the judicial district, so as to be served with process, where the party had *no property* within such district. We would ask what difference there is, in reason, between the cases in which he *has*, and has *not* such property? In the one case, as in the other, the court renders judgment against a person who has no notice of the proceeding. In the one case, as in the other, they are acting on the rights of a person who is beyond the limits of their jurisdiction, and upon whom they have no power to cause process to be personally served. If there be such a difference, we are unable to perceive it.

In examining the two restraining clauses of the eleventh section, we find that the process of capias is in terms limited to the district within which it is issued. Then follows the clause which declares that no civil suit shall be brought before either of the said courts, against an inhabitant of the United States, by any original process, in any other district than that whereof he is an inhabitant, or in which he shall be found at the time of serving the writ. We think that the true construction of this clause is, that it did not mean to distinguish between those who are inhabitants of, or found within the district, and persons domiciled abroad; so as to protect the first, and leave the others not within the protection: but that even in regard to those who were within the United States, they should not be liable to the process of the circuit courts, unless in one or the other predicament stated in the clause: and that as to all those who were not within the United States, it was not in the contemplation of congress, that they would be at all subject, as defendants, to the process of the circuit courts, which, by reason of their being in a

foreign jurisdiction, could not be served upon them; and therefore there was no provision whatsoever made in relation to them.

If, indeed, it be assumed that congress acted under the idea that the process of the circuit courts could reach persons in a foreign jurisdiction, then the restrictions might be construed as operating only in favour of the inhabitants of the United States, in contradistinction to those who were not inhabitants; but, upon the principle which we have stated, that congress had not those in contemplation at all, who were in a foreign jurisdiction, it is easy to perceive why the restriction in regard to the process was confined to inhabitants of the United States. Plainly, because it would not have been necessary or proper to apply the restriction to those whom the legislature did not contemplate, as being within the reach of the process of the courts, either with or without restrictions.

With these views, we have arrived at the same conclusions as the circuit court of Massachusetts, as announced in the following propositions, viz: 1st. That by the general provisions of the laws of the United States, the circuit courts can issue no process beyond the limits of their districts. 2d. That independently of positive legislation, the process can only be served upon persons within the same districts. 3d. That the acts of congress adopting the state process, adopt the form and modes of service, only so far as the persons are rightfully within the reach of such process, and did not intend to enlarge the sphere of the jurisdiction of the circuit courts. 4th. That the right to attach property, to compel the appearance of persons, can properly be used only in cases in which such persons are amenable to the process of the court, in personam; that is, where they are inhabitants, or found within the United States; and not where they are aliens, or citizens resident abroad, at the commencement of the suit, and have no inhabitancy here: and we add, that even in case of a person being amenable to process in personam, an attachment against his property cannot be issued against him; except as part of, or together with process to be served upon his person.

The next inquiry is, whether the process of attachment having issued improperly, there has any thing been done which has cured the error? And we think that there is enough apparent on the record, to produce that effect. It appears that the party appeared, and pleaded to issue. Now, if the case were one of a want of jurisdiction in the court, it would not, according to well established principles, be competent for the parties by any act of theirs, to give it. But that is not the case. The court had jurisdiction over the parties

[Toland v. Sprague.]

and the matter in dispute; the objection was, that the party defendant, not being an inhabitant of Pennsylvania, nor found therein, personal process could not reach him; and that the process of attachment could only be properly issued against a party under circumstances which subjected him to process in personam. Now this was a personal privilege or exemption, which it was competent for the party to waive. The cases of Pollard v. Wright, 4 Cranch, 421; and Barry v. Foyles, 1 Peters, 311; are decisive to show, that after appearance and plea, the case stands as if the suit were brought in the usual manner. And the first of these cases proves that exemption from liability to process, and that in case of foreign attachment, too, is a personal privilege, which may be waived; and that appearing and pleading will produce that waiver.

It has, however, been contended, that although this is true as a general proposition, yet the party can avail himself of the objection to the process in this case, because it appears from the record, that a rule was obtained by him to quash the attachment, which rule was afterwards discharged; thus showing, that the party sought to avail himself of the objection below, which the court refused. In the first place, it does not appear upon the record, what was the ground of the rule; but if it did, we could not look into it here, unless the party had placed the objection upon the record, in a regular plea; upon which, had the court given judgment against him, that judgment would have been examinable here. But in the form in which it was presented in the court below, we cannot act upon it in a court of error. The judiciary act authorizes this Court to issue writs of error to bring up a final judgment or decree in a civil action, or suit in equity, &c. The decision of the court upon a rule, or motion, is not of that character. This point, which is clear upon the words of the law, has been often adjudged in this Court; without going further, it will be sufficient to refer to 6 Peters, 648; 9 Peters, 4. In the first of these cases the question is elaborately argued by the Court, with a review of authorities; and they come to this conclusion that they consider all motions of this sort (that is) to quash executions, as addressed to the sound discretion of the Court; and as a summary relief, which the Court is not compellable to allow. That the refusal to quash is not, in the sense of the common law, a judgment; much less is it a final judgment. It is a mere interlocutory order. Even at common law, error only lies from a final judgment; and by the express provisions of the ju-

SUPREME COURT.

diciary act, a writ of error lies to this Court only in cases of final judgments.

Having now gotten rid of these preliminary questions, we come, in the order of argument, to the merits of the case. To understand these, it will be necessary to look into the pleadings, the evidence, and charge of the court, as embodied in the exceptions.

The declaration is in assumpsit, and originally contained three counts, viz., the first, a count charging the delivery of certain goods to the defendant, upon a promise to account and pay over the proceeds, or sale thereof, by the defendant; and a breach of promise, in not accounting, or paying the proceeds of the sale. 2dly. A count in indebitatus assumpsit; and 3dly, a count upon an account stated. A rule having been granted to amend the declaration, by striking out this last count, and that rule having been made absolute, we shall consider the declaration as containing only the two first counts. To this declaration the defendant pleaded the general issue, which was joined by the plaintiff, and also the act of limitations; to this second plea, the plaintiff replied, relying on the exception in the statute in favour of such accounts as concern the trade of merchandise between merchant and merchant, their factors or servants; averring that the money in the several promises in the declaration became due and payable on trade had between the plaintiff and defendant, as merchant, and merchant and factor, and wholly concerned the trade of merchandise between the plaintiff as a merchant, and the defendant as a merchant and factor of the plaintiff; and averring, also, that no account whatever of the said money, goods, and merchandises, in the declaration mentioned, or any part thereof, was ever stated, or settled between them. The defendant rejoined, that he was not the factor of the plaintiff; and that the money in the several promises in the declaration mentioned, did not become due and payable in trade had between the plaintiff and defendant as merchant, and merchant and factor; and on this, issue was joined. On the trial of these issues, there were sundry letters between the parties, and accounts given in evidence, which are set forth at large in a bill of exceptions, in relation to which the court gave a charge to the jury; the jury having found a verdict for the defendant, and the court having rendered a judgment in his favour, the case is brought by the plaintiffs, into this Court, by writ of error. And the question is, whether there is any error in the charge of the court, as applied to the facts of the case stated in the exception. The court, after going

at large into the facts of the case, and the principles of law applying to it, concluded with this instruction to the jury: That there was no evidence in the cause, which could justify them in finding that the account in evidence, was such a mutual, open one, as could bring the case within the exception of the act of limitations.

In deciding upon the correctness of this instruction, it is necessary to inquire what is the principle of law by which to test the question, whether a case does or does not come within the exception of the statute, in favour of accounts between merchant and merchant, their factors or servants. No principle is better settled, than, that to bring a case within the exception, it must be an account; and that, an account open, or current. See 2d Wms. Saund. 127, d. e., note 7. In 2 Johns. 200, the Court say that the exception must be confined to actions on open or current accounts; that it must be a direct concern of trade; that liquidated demands, or bills and notes which are only traced up to the trade or merchandise, are too remote to come within this description. But the case of Spring and others v. The Ex'rs. of Gray, in this Court: 6 Peters, 151; takes so full and accurate a review of the doctrine and cases, as to render it unnecessary to refer to other authorities. It distinctly asserts the principle, that the account, to come within the exception, must be open or current. This construction, so well settled on authority, grows out of the very purpose for which the exception was enacted. That purpose was, to prevent the injustice and injury which would result to merchants having trade with each other, or dealing with factors, and living at a distance, if the act of limitations were to run, where their accounts were open and unsettled; where, therefore, the balance was unascertained, and where, too, the state of the accounts might be constantly fluctuating, by continuing dealings between the parties.

But when the account is stated between the parties, or when any thing shall have been done by them, which, by their implied admission, is equivalent to a settlement, it has then become an ascertained debt. In the language of the court of appeals of Virginia, 4 Leigh, 249, " all intricacy of account, or doubt as to which side the balance may fall, is at an end;" and thus the case is neither within the letter nor the spirit of the exception. In short, when there is a settled account, that becomes the cause of action, and not the original account, although it grew out of an account between merchant and merchant, their factors or servants.

Let us now inquire how far this principle applies to the facts of

[Toland v. Sprague.]

this case. It appears by the bill of exceptions, that the facts are these:

In the year 1824, the plaintiff consigned a quantity of merchandise, by the ship William Penn, bound for Gibraltar, to a certain Charles Pettit, accompanied with instructions as to the disposition of it. Pettit, after arriving at Gibraltar, and remaining there a short time, placed all the merchandise belonging to the plaintiff, which remained unsold, in the hands of the defendant, to be disposed of by him, for plaintiff's account. The plaintiff produced on the trial, an account of the sales of the aforesaid merchandise, dated June 30th, 1825, signed by the defendant, as having been made by him, amounting in nett proceeds to two thousand five hundred and seventy-nine dollars and thirteen cents; and showing that balance.

In September, 1825, the plaintiff wrote to the defendant, requesting him to remit to him the nett proceeds of this merchandise, amounting to two thousand five hundred and seventy-nine dollars and thirteen cents; after deducting therefrom a bill of exchange of one thousand dollars, which had been drawn by defendant in favour of Charles Pettit, on a house in New York. Pettit being indebted to the defendant, as alleged by him, in a large sum of money, for advances, and otherwise, the defendant refused to pay the plaintiff the amount of the sales of the merchandise; and denied his liability to account to him therefor.

In addition to the demand before stated, by plaintiff on the defendant, for the balance of the account of sales by letter, on the trial of the cause, the counsel for the plaintiff, in opening the case, claimed the balance of an account between Sprague, the defendant, and Charles Pettit; being the precise amount of the balance of the account of sales, after deducting the bill of exchange for one thousand dollars.

It appears that the plaintiff was in possession of the account of sales as early as September, 1825.

Upon this state of facts appearing in the record, the question is, whether the cause of action in this case is an open, or current account between the plaintiff and defendant, as merchant and factor, concerning merchandise; or whether it is an ascertained balance, a liquidated sum, which, although it grew out of a trade of merchandise, is, in legal effect, under the circumstances, a stated account? We think it is the latter.

In the language of the court who gave the charge, we think that

[Toland v. Sprague.]

"the claim is for a precise balance, which was demanded by the plaintiff from the defendant in 1825." From the nature of the account, and the conduct of the parties, there was from the time the account of sales was received by the plaintiff showing the balance, and demanded by the plaintiff of the defendant, no unsettled open account between them as merchant and merchant, or merchant and factor. We agree in opinion with the circuit court that there was a matter of controversy brought to a single point between them; that is, which of them had, by law, a right to a sum of money, ascertained by consent to amount to one thousand five hundred and seventy-nine dollars. That the nature of the account is not changed by there being a controversy as to a balance stated, which the defendant does not ask to diminish, or the plaintiff to increase; and as neither party asks to open the account, and both admit the same balance, there can be no pretence for saying that it is still open. As the circuit court say, the question between them is not about the account, or any item in it; but as to the right of the defendant to retain the admitted balance, to repay the advances made to Pettit. We agree with the court, that the mere rendering an account does not make it a stated one; but that if the other party receives the account, admits the correctness of the items, claims the balance, or offers to pay it, as it may be in his favour or against him; then it becomes a stated account. Nor do we think it at all important that the account was not made out as between the plaintiff and defendant; the plaintiff having received it, having made no complaint as to the items or the balance, but on the contrary having claimed that balance, thereby adopted it; and by his own act treated it as a stated account. We think, therefore, that the act of limitations began to run from the year 1825, when that demand was made; and consequently that the instruction of the court was correct in saying that it was not within the exception.

It has however been argued, that whatever might be the conclusion of the court, as resulting from the evidence, that the defendant had admitted upon the record that the account was an open one. It is said, that the plaintiff having averred in his replication that there was no account stated, or settled between him and the defendant, and the defendant not having traversed that averment in his rejoinder, the matter contained in that averment is admitted. It is a rule in pleading, that where in the pleading of one party there is a material averment, which is traversable, but which is not traversed by the other party, it is admitted. We think that the rule does not apply to this

[Toland v. Sprague.]

case, because the negative averment in the replication that no account had been stated between the parties, was not a necessary part of the plaintiff's replication, to bring him within the exception of the statute in relation to merchants' accounts. Inasmuch, then, as the replication without that averment would be sufficient; we do not consider it as one of those material averments, the omission to traverse which is an admission of its truth, within the rule before stated.

But in another aspect of this case the statute of limitations would apply to, and bar the plaintiff's claim; if the account of sales were regarded as having no operation in the case. The plaintiff, standing in the relation which he did to the defendant, as it respects this merchandise, had a right to call upon him to account; he did make that demand, and the defendant refused to render one, holding himself liable to account to Pettit only. From the moment of that demand and refusal, the statute of limitations began to run. See 1 Taunton, 572.

It was argued that the question whether there was a stated account or not, was a question of fact for the jury; and that therefore the court erred in taking that question from them, and telling them that this was a stated account.

The answer is, that there was no dispute about the facts; and that the plaintiff claimed the balance of the account as being the precise sum due to him. It was therefore competent to the court to instruct the jury that it was a stated account.

Upon the whole, we think there is no error in the judgment: it is therefore affirmed, with costs.

Mr. Chief Justice TANEY:

I concur with the majority of the Court in affirming the judgment of the circuit court. But I do not assent to that part of the opinion which declares that the circuit courts of the United States have not the power to issue the process of attachment against the property of a debtor, who is not an inhabitant of the United States. It does not appear by the record that this point was raised in the court below; and I understand from the learned judge who presided at the trial, that it was not made.

The decisions on this question have not been uniform at the circuits. In several districts where this process had been authorized by the laws of the states, the circuit courts of the United States adopted it in practice; and appeared to have considered the act of congress of

[Toland v. Sprague.]

1789, as having authorized its adoption. The different opinions entertained in different circuits, show that upon this point the construction of the act of 1789 is not free from difficulty; and as the legality of this process has been recognised in some of the circuits for many years, it is probable that condemnations and sales have taken place under such attachments, and that property is now held by bona fide purchasers who bought, and paid their money, in the confidence naturally inspired by the judgment of the court.

If the case before us required the decision of this question, it would be our duty to meet it and decide it. But the point is not necessarily involved in the decision of this case; and I am, therefore, unwilling to express an opinion upon it.

The attachment, in the case before us was dissolved by the appearance of the defendant; and no final judgment was given upon it in the court below. When the defendant appeared and pled in bar to the declaration filed by the plaintiff, the controversy became an ordinary suit between plaintiff and defendant; the proceedings on the attachment were at an end, and could in no degree influence the future progress and decision of the action. And this Court, in revising the judgment given by the circuit court in such an action, cannot look back to the proceedings in the attachment in which no judgment was given; nor can the refusal of the circuit court to quash the attachment on the motion made by the defendant, be assigned as error in this Court. The validity of that process, therefore, need not be drawn into question in the judgment of this Court, on the case presented here for decision. For whether the attachment was legal or illegal, the judgment of the circuit court, as the case comes before us, must be affirmed. And as the question is an important one, and may affect the rights of individuals who are not before the Court, and as the case under consideration does not require us to decide it; I think it advisable to abstain from expressing an opinion upon it: and do not assent to that part of the opinion of the Court which declares that the process in question is not authorized by the acts of congress.

Mr. Justice BALDWIN agreed with the Chief Justice in the opinion delivered by him; if it was necessary, he would go further as to the authority of the courts of the United States to issue foreign attachments.

Mr. Justice WAYNE agreed with the Chief Justice in opinion. He

[Toland v. Sprague.]

thought the circuit courts of the United States had authority to issue foreign attachments. The decision on that point, is not necessary to the decision of this case.

Mr. Justice CATRON had not formed any opinion on the question of the right of the circuit courts to issue foreign attachments. He thought that question did not come before the Court in this case; and it was not necessary to examine or decide it.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the eastern district of Pennsylvania, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this Court, that the judgment of the said circuit court in this cause be, and the same is hereby affirmed, with costs.