**LONE STAR PACKAGE CAR CO., Inc.**

v.

**BALTIMORE & O. R. CO. et al.**

**No. 14336.**

United States Court of Appeals,
Fifth Circuit.

April 15, 1954.

---

Malcolm R. Wilkey, Houston, Tex., Norman S. Rein, New York City, Rein, Mound & Cotton, New York City, Frank J. Knapp, Percy Don Williams, Butler, Binion, Rice & Cook, Houston, Tex., of counsel, for appellant.

Elmore H. Borchers, Laredo, Tex., Palmer Hutcheson, Jr., M. S. McCorquodale, Houston, Tex., Frank H. Cole, Jr., Cincinnati, Ohio, Hutcheson, Taliaferro & Hutcheson, Houston, Tex., of counsel, for appellees.

Before HOLMES, RUSSELL and RIVES, Circuit Judges.

RIVES, Circuit Judge.

The questions to be decided are whether a third party complaint was properly served on the Baltimore and Ohio Railroad Company, whether the district court acquired jurisdiction of that company, and whether the venue was properly laid.

The original action was brought in the district court by Insurance Company of North America, a Pennsylvania corporation, against Lone Star Package Car Company, Inc., a Texas Corporation,[1] to recover for damages occurring to a shipment of machinery made from Philadelphia, Pennsylvania to Laredo, Texas, and for damages occurring on the return shipment from Laredo to Philadelphia. Insurance Company is subrogated to the rights of one Mauricio Atri, a citizen of Mexico, owner of the machinery, who is

---

1. The parties will be referred to as follows: Appellant Lone Star Package Car Company, Inc., "Lone Star"; Appellee The Baltimore & Ohio Railroad Company, "B. & O."; Appellee Insurance Company of North America, "Insurance Company"; and Appellee The Texas Mexican Railway Company, "Texas Mexican".

not a party to the suit. Lone Star, a freight forwarder, delivered to the shipper its bill of lading for the goods.

The original complaint was brought both as a common law action for damages with jurisdiction based on diversity of citizenship, and as an action under the Carmack Amendment, 49 U.S.C.A. § 20 (11). Lone Star filed a third party complaint against B. & O. and Texas Mexican for any sums awarded Insurance Company. According to the Marshal's return, service of process was had on L. W. Land, Southwestern Freight Representative of the B. & O. in Dallas, and on D. E. Barcus, District Freight Representative of the B. & O. in Houston. B. & O., the third party defendant, moved to quash the return of service of the summons, to abate the third party action for improper venue, and to dismiss such action for lack of jurisdiction over the third party defendant, all based on the ground that the B. & O. was a foreign corporation not residing nor doing business in the judicial district nor in the State of Texas.

The trial court dismissed the third party action against B. & O. on the ground "that this Court does not have jurisdiction over said, The Baltimore & Ohio Railroad Company, a foreign corporation, and that it is not a resident or inhabitant of the State of Texas nor of this judicial district, nor is it doing business in either said state or district of such nature as to subject it to the jurisdiction of this Court in the instant case." From the order dismissing B. & O. as a third party defendant, Lone Star prosecutes this appeal.

The original shipper delivered the machinery in question to Lone Star and received its bill of lading for transportation of the same from Philadelphia, Pennsylvania, to Laredo, Texas. B. & O. received the shipment from Lone Star at Philadelphia and undertook to transport it to St. Louis, Missouri, issuing therefor its bill of lading to that point, where it agreed to deliver the goods to Lone Star. Carriage from St. Louis to the south began with the **Frisco Lines**, which received the machinery from Lone Star. The Frisco and Texas Mexican transported the machinery to Laredo where damage was discovered. Following discovery of damage, the delivering carrier, Texas Mexican, arranged for return of the machinery free of charge to the shipper in care of the originating carrier, B. & O., in Philadelphia in accordance with railroad custom, this returning shipment on through bill of lading originating on the Texas Mexican and traveling via Southern Pacific, Frisco, and ultimately the B. & O. During the course of transit from Laredo to Philadelphia further damage occurred to the machinery.

As shown by the affidavits of L. W. Land, Southwestern Freight Agent of the B. & O. with office at Dallas, and D. E. Barcus, District Freight Representative with office in Houston, the B. & O. is a Maryland corporation having no permit to do business in Texas and doing no business therein except such business as may be done by Mr. Land's and Mr. Barcus' offices. The lines of the B. & O. do not come west of St. Louis or south of Kentucky. As Southwestern Freight Agent of the B. & O. in Dallas, Land's territory embraces most of Texas and half of Old Mexico. Operating under him are the Houston District office and one individual stationed at San Antonio, although no office is maintained at San Antonio. Dallas offices consist of four rooms and have been occupied continuously for over twenty years. In Houston the B. & O. emblem with the words "Traffic Department" appear on the door of its three room suite in the Bankers Mortgage Building.

Land in Dallas and Barcus in Houston, and the B. & O. employees serving under them, solicit traffic from and to points within the State of Texas which can be moved on the B. & O. They receive and process complaints of delay and nondelivery in Texas. If a shipment is damaged in transit coming into Texas, they talk to the consignee about it, but persuade him to see the delivering carrier. If the shipment originates in Texas, they

use their teletype linkage with the B. & O. system to have an investigation made by the B. & O. as to the damage in transit and deal with the customer directly on it. If a shipment is misplaced or lost, they start at the source of the shipment and trace the movement from point to point, and notify either the shipper or the consignee in Texas where the delay occurred. The B. & O. operates what is known as a "Sentinel Service", whereby the shipment can be monitored along the entire route, and the B. & O. representatives can inform consignee or shipper exactly where his car is and where it is going at all times. About ten shippers or receivers a day call the Dallas office tracing shipments.

The B. & O. representatives personally make no rate calculations or adjustments, but refer them to the Baltimore office. They do make investigations of rate complaint cases, make personal calls on the customers and try to make sure that the customer is satisfied. In the case of damaged goods belonging to a Texas shipper, the B. & O. representatives instruct him "to file his claim and I will help him collect it." The Texas B. & O. representative follows through on the claim adjustment and settlement, and on claims of some of the more valued customers, the B. & O. representatives personally take him the checks in settlement of the claim. The duties of the Houston office in regard to the matters mentioned are the same as the Dallas Office.

The B. & O. representatives prepare a monthly situation letter analyzing business conditions from the standpoint of B. & O. business in Texas in accordance with instructions from the home office. They also prepare special reports from time to time concerning some industry the B. & O. has under study. As part of their service to customers, the B. & O. representatives in Texas sometimes work up special pamphlets for shippers in various industries, putting together all of the information needed for their particular problems.

Managing officials of the B. & O. make quarterly visits to Dallas and other parts of Texas, staying a week at a time in the Dallas area, and make their headquarters in the Dallas office while there. These officials also come to Houston. The purpose of these visits is to contact all customers, shippers or consignees, with whom the B. & O. does business. Land makes it a point to take them to the dissatisfied customers first, to help satisfy and smooth over complaints. These officials make an investigation of some of these complaints on the spot.

The average telephone bill of the Dallas office is $100 per month, but the greater part of the communications are carried on by telegraph and teletype. The teletype system is used quite extensively, and handles a great variety as well as volume of messages. There are two machines, both being sending and receiving, in the Dallas office. One operates on a line leased from Western Union by the B. & O., and connects B. & O. offices in Tulsa, Kansas City, Houston, Dallas and St. Louis. Through St. Louis the Dallas and Houston offices are thus linked with the entire B. & O. system. The other teletype machine is connected with the normal commercial circuits of Western Union.

The Dallas office has five freight employees and three passenger employees, with a total monthly payroll of $3,100. There are five employees in the Houston offices with a total payroll of approximately $1,900 a month. All employees are paid by check from the Baltimore offices of the B. & O., and the same is true for employees in St. Louis and throughout the system. The Texas offices of the B. & O. do not handle any money of the company. Some employees have expense accounts and two automobiles are furnished to the traveling freight representatives. All personnel required to travel have railroad passes good over lines in Texas corresponding to their territory. All employees are covered by the B. & O. pension plan. Stationery and office supplies are furnished.

on requisition from Baltimore, but office furniture is frequently bought locally and so are automobiles.

Advertising in Texas is not handled through any of the B. & O. local offices but is handled by the advertising department in Baltimore. Land receives notices from the B. & O. main office whenever advertising is run in any one of several national magazines, mostly trade in character. The same is true of advertising in local newspapers. The Dallas office itself has a mailing list for advertising calendars, which are mailed out from there.

Passenger service procedure is handled by the B. & O. in the following manner. After an inquiry for passenger service, the B. & O. secures reservations on its lines and informs the ticket office of the local carrier and requests tickets to be made up for the prospective passengers. Passengers receive and pay for their tickets at the ticket office of the local carrier. Teletype network of the B. & O. is used frequently to confirm these passenger reservations, with telegrams being sent to the passengers in confirmation. The offices in Houston and Dallas trace any lost passenger baggage for any persons arriving in Texas after having traveled over the B. & O. lines.

The Dallas and the Houston B. & O. offices keep a record of all tonnage handled by the B. & O. coming into Texas or leaving Texas. These reports are made monthly and annually by the Houston Office to Dallas and by Dallas to the B. & O. central office. In 1951 the B. & O. reported 15,761 carloads of traffic carried by it originating in Texas, totaling 516,323 tons. The inbound traffic was greater, totaling 22,061 carloads, or 609,443 tons for the State of Texas.

At the outset of our discussion of the applicable legal principles, we acknowledge the considerable advantage which we enjoy of an excellent opinion by the district court, reported in Insurance Co. of North America v. Lone Star Package Car Co., 107 F.Supp. 645 to 658, covering this case and five other cases. The basic question to be decided is whether the B. & O. was doing business in Texas in such manner as to be subject to the service of process and to the jurisdiction of the federal district court in Texas. Assuming that basic question to be answered in the affirmative, no difficulty arises as to the service of process or as to the venue. In the interest of clarity, however, we first briefly consider the process and venue questions.

Rule 4, Federal Rules of Civil Procedure, 28 U.S.C.A., provides in part:

> *"Rule 4. Process*
>
> \* \* \* \* \* \*
>
> "(d) *Summons: Personal Service.* \* \* \* Service shall be made as follows:
>
> \* \* \* \* \* \*
>
> "(3) Upon a domestic or foreign corporation \* \* \* by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the defendant.
>
> \* \* \* \* \* \*
>
> "(7) Upon a defendant of any class referred to in paragraph (1) or (3) of this subdivision of this rule, it is also sufficient if the summons and complaint are served in the manner prescribed by any statute of the United States or in the manner prescribed by the law of the state in which the service is made for the service of summons or other like process upon any such defendant in an action brought in the courts of general jurisdiction of that state.
>
> \* \* \* \* \* \*
>
> "(f) *Territorial Limits of Effective Service.* All process other than a subpoena may be served anywhere within the territorial limits of the state in which the district court is held \* \* \*."

█ If a corporation's business is so substantial as to render the corporation amenable to suit in the state, its principal agent in charge of activities within that state meets the test of a "managing agent". Krnach v. Electro Lift, Inc., D. C.N.D.Ohio, 13 F.R.D. 131, 133. Hence, with the indicated assumption, service was authorized under Rule 4(d) (3).

Further, Rule 4(d) (7), supra, authorizes service of process in the manner prescribed by the law of the State of Texas and Article 2031 of the Revised Civil Statutes of Texas, Vernon's Ann.Civ. St. art. 2031, provides:

> "Art. 2031. In any suit against a foreign corporation, * * * pending or hereafter filed in this State, to which any foreign corporation is a party or is to be made a party, process may be served on the President, Vice-President, Secretary, Treasurer, General Manager, or upon any local or travelling agent or travelling salesman of such corporation, * * * in this State."

That statute in its present form was enacted in 1935. It *removed* a restriction in the previous statute limiting the cases where process might be served upon any local or traveling agent or traveling salesman to suits "upon any cause of action arising within the State of Texas", Acts 1919, p. 181, Ch. 115; Gammel's Laws, Vol. 19.

We conclude that, if jurisdiction exists, there was effective service of process.

As to venue, we call attention that Professor Moore maintains the view that the third party claim should be regarded as ancillary to the main claim and that no independent ground, either jurisdictional or for venue, should be required, 3 Moore's Federal Practice, 2d ed., Sec. 14.25, p. 493. He states that, "The great weight of authority is in accord with this view." Id. Sec. 14.26, p. 496, citing many cases. He concedes, however, that a few cases have held the other way, and we may note that in Akers Motor Lines v. Newman, 5 Cir., 168 F.2d 1012, 1013, this Court construed a complaint "not * * * as merely asserting a right to indemnity ancillary to the main suit, but rather as substituting a wholly separate and distinct cause of action from that alleged in the original complaint." In the present case, the third party plaintiff seeks merely to be indemnified as to any recovery against it by the original plaintiff, and, hence, this third party action appeared to be ancillary to the main suit.

If the third party action is not so considered as ancillary to the original action, then the venue of the third party action would be prescribed by 28 U.S.C. A. § 1391(b) and (c):

> "§ 1391. *Venue generally*
>   * * * * * *
>
> "(b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, except as otherwise provided by law.
>
> "(c) A corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as the residence of such corporation for venue purposes."

We come back then to the question of whether the B. & O. was doing business in Texas, and perhaps also to the question of whether it was doing business in the judicial district, in such manner as to be subject to the jurisdiction of the federal district court. The district court considered the question a very close one, but felt that it was bound by the case of Green v. Chicago, Burlington & Quincy R. Co., 205 U.S. 530, 27 S.Ct. 595, 51 L.Ed. 916.[2] The district court fur-

---

2. "Of all of the present cases, I have found difficulty in my own mind in reaching a decision only as to the B. & O. From the facts before me, it appears that the case is a very close one. * * * On the basis of that decision, (Green v. Chicago, Burlington & Quincy R. Co., supra,) with some reluctance, I feel the motion of B. & O., to dismiss should be sustained."

ther stated that it determined that jurisdiction cannot be maintained over the B. & O. within constitutional limits, and that the proper approach would be that stated by the First Circuit in Pulson v. American Rolling Mill Co., 170 F.2d 193, 194:

"There are two parts to the question whether a foreign corporation can be held subject to suit within a state. The first is a question of state law: has the state provided for bringing the foreign corporation into its courts under the circumstances of the case presented? There is nothing to compel a state to exercise jurisdiction over a foreign corporation unless it chooses to do so, and the extent to which it so chooses is a matter for the law of the state as made by its legislature. If the state has purported to exercise jurisdiction over the foreign corporation, then the question may arise whether such attempt violates the due process clause or the interstate commerce clause of the federal constitution. Const. art. 1, Sec. 8, cl. 3; Amend. 14. This is a federal question and, of course, the state authorities are not controlling. But it is a question which is not reached for decision until it is found that the State statute is broad enough to assert jurisdiction over the defendant in a particular situation."

That approach was approved by this Court in Rosenthal v. Frankfort Distillers Corp., 193 F.2d 137, 141, and is indicated by the Supreme Court in Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 440, 72 S.Ct. 413, 96 L.Ed. 485.

Actually, the district court considered the constitutional question first, expressing its reason therefor as follows: "The cart-before-the-horse consideration which these questions have received here results from the fact that I construe the Texas statute and cases interpreting same rather broadly, and feel that the greater jurisdictional burden is imposed by the federal cases testing constitutionality than by the state cases testing the application of the state statute."[3]

Counsel for both parties have employed the same approach in their briefs and arguments and this has caused us considerable concern because, after repeated efforts, we have not been able to reach a satisfactory solution of the problem by that approach. It now appears to us to be the correct approach in cases where jurisdiction is based solely on diversity of citizenship, whether the cases are removed from the state court as in Rosenthal v. Frankfort Distillers Corp., supra, or filed originally in the federal court as in Pulson v. American Rolling Mill Co., supra.[4]

The indicated approach seems to us basically erroneous where the power of the federal court is invoked not solely on the ground of diversity of citizenship, but can be independently sustained, as in this case,[5] on the ground

3. We note, incidentally, at this point that on the Texas state law the district judge differed with the views of this Court's Chief Judge as expressed in Rosenthal v. Frankfort Distillers Corp., 5 Cir., 193 F. 2d 137, see 107 F.Supp. at pages 656 and 657. Similar views of our Chief Judge as to Texas state law have again been expressed in Robbins v. Benjamin Air Rifle Co., 5 Cir., 209 F.2d 173. We express no opinion on this difference, but entertain the hope that the question may be authoritatively settled by the highest state court, the Supreme Court of Texas.

4. Since Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, and Angel v. Bullington, 330 U.S. 183, 192,

67 S.Ct. 657, 91 L.Ed. 832, it would seem that in both classes of cases the Erie rule is applicable on the question of whether a foreign corporation is doing business in a state in such manner as to subject itself to local jurisdiction. See Partin v. Michaels Art Bronze Co., 3 Cir., 202 F.2d 541, 542, note 2; Woods v. Interstate Realty Co., 337 U.S. 535, 69 S. Ct. 1235, 93 L.Ed. 1524.

5. A suit under the Carmack Amendment arises of course under a law of the United States. Peyton v. Railway Express Agency, 316 U.S. 350, 62 S.Ct. 1171, 86 L.Ed. 1525; Strickland Transportation Co. v. American Distributing Co., 5 Cir., 198 F.2d 546, 547.

that the matter in controversy arises under the Constitution, laws or treaties of the United States. 28 U.S.C.A. § 1331. The court carefully noted in Angel v. Bullington, 330 U.S. 183, 192, 67 S.Ct. 657, 662, 91 L.Ed. 832, that "Of course, where resort is had to a federal court not on grounds of diversity of citizenship but because a federal right is claimed, the limitations upon the courts of a State do not control a federal court sitting in the State." Neither of the constitutional questions suggested in the quotation from Pulson v. American Rolling Mill Co., supra, can arise in a case where a federal court's jurisdiction is based on the assertion of a federal right. In such a case Congress can provide for service of process anywhere in the United States. Mississippi Publishing Corp. v. Murphree, 326 U.S. 438, 442, 66 S.Ct. 242, 90 L.Ed. 185; Howard v. United States, ex rel. Alexander, 10 Cir., 126 F. 2d 667, 668; Blank v. Bitker, 7 Cir., 135 F.2d 962, 965. Professor Moore states that, "Whether a foreign corporation or other business entity is doing business in a state is a matter of general, not local, law." 2 Moore's Federal Practice, 2d ed., Sec. 4.25, pp. 969, 970. That statement seems to us sound when federal jurisdiction is not based upon state law. In support of that statement, professor Moore cites the leading case of Barrow Steamship Co. v. Kane, 170 U.S. 100, 18 S.Ct. 526, 42 L.Ed. 964. There it was declared, "but the jurisdiction of the circuit courts of the United States is not created by, and does not depend upon, the statutes of the several states." 170 U.S. at page 110, 18 S.Ct. at page 529. Further, "The action was within the general jurisdiction conferred by congress upon the circuit courts of the United States. The fact that the legislature of the state of New York has not seen fit to authorize like suits to be brought in its own courts by citizens and residents of other states cannot deprive such citizens of their right to invoke the jurisdiction of the national courts under the constitution and laws of the United States." 170 U.S. at pages 112, 113, 18 S.Ct. at page 530. This Court recently had occasion to enunciate the same rule. "But here the jurisdiction of the federal court was not created by, and does not depend upon, the statutes of the several states. Barrow Steamship Co. v. Kane, 170 U.S. 100, 111, 18 S.Ct. 526, 42 L.Ed. 964." Carmack v. Panama Coca Cola Bottling Co., 5 Cir., 190 F.2d 382, 385, 30 A.L.R.2d 281.

Notwithstanding what we think was an erroneous reference to constitutional questions not here involved consequent upon a mistaken approach to the solution of the problem, the district court was on sound ground in holding that, if the case of Green v. Chicago, Burlington & Quincy R. Co., supra, is still the law and is applicable to the facts of this case, then the district court had no jurisdiction over the B. & O., the third party defendant. The decision in the Green case is not predicated on any violation of constitutional limits by retaining jurisdiction, but is in line with the reasoning in Barrow Steamship Co. v. Kane, supra; and, coming before Erie Railroad Co. v. Tompkins, supra, considered diversity jurisdiction the same as other federal jurisdiction.[6] The district court recognized that the Green case, supra, had been strictly limited [7] and much criticized,[8] and that a close question was

---

6. For whatever it may be worth, we call attention that in the Green case, supra, the court noted what is not true of the present case, viz: "The jurisdiction of the circuit court in this case was founded solely upon the fact that the parties were citizens of different states."

7. See among other cases, International Harvester Co. v. Kentucky, 234 U.S. 579, 586, 34 S.Ct. 944, 58 L.Ed. 1479; St. Louis Southwestern Railway Co. v. Alexander, 227 U.S. 218, 227, 33 S.Ct. 245, 57 L.Ed. 486.

8. See among other cases, Hutchinson v. Chase & Gilbert, Inc., 2 Cir., 45 F.2d 139, 141, opinion by Judge Learned Hand; Frene v. Louisville Cement Company, 77 U.S.App.D.C. 129, 134 F.2d 511, 146 A.L.R. 926, opinion by Judge Rutledge.

presented as to whether the facts of this case showed enough in addition to mere solicitation to distinguish it from the Green case, supra.

In any event, so much has now been written upon the subject that we content ourselves with saying that we are satisfied that insofar as cases are governed by federal law, the question of whether they are to be tried in one locality or another is now to be tested not by the rigid rule of the Green case, supra, but simply by basic principles of fairness. International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, United States v. Scophony Corp. of America, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091; Travelers Health Association v. Com. of Virginia, ex rel. State Corp. Comm., 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154; Perkins v. Benquet Consolidated Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485. It is true that in most of the cases just cited the question has arisen as to constitutional limitations imposed upon the states, but the broad statements of policy expressed, particularly in the International Shoe Co. case, supra, seem to us to be extended also to cases where the jurisdiction of the federal court depends upon federal law. United States v. Scophony Corp. of America, supra, was such a case, and there Mr. Justice Rutledge, writing for the court, clearly stated that, "Refinements such as previously were made under the 'mere solicitation' and 'solicitation plus' criteria, cf. Frene v. Louisville Cement Company, supra (77 U.S.App.D.C. 129, 134 F.2d 511, 146 A. L.R. 926), * * * were no longer determinative." 333 U.S. at page 807, 68 S.Ct. at page 861.[9]

Without extending this opinion, already too long, we hold that, under the tests of fairness elaborated in the foregoing cases, the facts of this case require

that the district court exercise jurisdiction over the B. & O., third party defendant. The judgment is therefore

Reversed.

---

9. See also the dissenting opinion of Mr. Justice Black, with whom Mr. Justice Jackson concurred, not opposed in this particular to the opinion of the Court in

Polizzi v. Cowles Magazines, Inc., 345 U. S. 663 at pages 669 and 670, 73 S.Ct. 900, 97 L.Ed. 1331.