John BRIGGS et al., Appellants,

v.

Guy GOODWIN, Individually and as Attorney for the Department of Justice, et al. [Stafford, et al.]

No. 75–1578.

United States Court of Appeals, District of Columbia Circuit.

Argued April 13, 1976.

Decided Sept. 21, 1977.

As Amended Dec. 1, 1977.

Rehearing Denied Dec. 1, 1977.

See also 186 U.S.App.D.C. ——, 569 F.2d 10.

Doris Peterson, New York City, with whom Nancy Stearns, Morton Stavis, New York City, and Philip J. Hirschkop, Alexandria, Va., were on the brief, Jack Levine, Philadelphia, Pa., for appellants.

R. John Seibert, Atty., Dept. of Justice, Washington, D. C., with whom Robert L. Keuch and Benjamin C. Flannagan, IV, Attys., Dept. of Justice, Washington, D. C., were on the brief, for appellees. George W. Calhoun, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for appellees.

Before McGOWAN, ROBINSON and WILKEY, Circuit Judges.

Opinion for the Court filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

During the summer of 1972, Guy Goodwin, an attorney in the Department of Justice, together with United States Attorney William H. Stafford, Jr.[1] and Assistant United States Attorney Stuart J. Carrouth for the Northern District of Florida, conducted therein grand jury proceedings at which appellants,[2] among others, were subpoenaed to appear. On motion by newly-retained counsel for appellants,[3] the District Judge responsible for those proceedings called Goodwin to the witness stand and inquired as to whether any of the "witnesses represented by counsel [were] agents or informants" of the Government.[4] Goodwin's sworn answer—"[n]o, Your Honor"[5] —is alleged to have been a knowing falsehood,[6] and its consequences to have been violative of various of appellants' constitutional rights.[7]

For redress of those consequences, appellants sued the three prosecutors and Claude Meadow, an agent of the Federal Bureau of Investigation,[8] "individually and in their official capacities,"[9] in the District Court here. Each appellant sought a declaratory judgment, $50,000 in compensatory dam-

---

1. Now United States District Judge for the Northern District of Florida.

2. Appellants were all members of the Vietnam Veterans Against the War/Winter Soldier Organization. Compare Brief for Appellees at 3 n. 1 with appellants' complaint ¶¶ 4–7, Appellants' Appendix (App.) 6–7.

3. According to the complaint, ¶¶ 10–12, App. 8–9, some of the subpoenas were returnable on the third succeeding day, and most of them compelled appearance at the same time; the witnesses summoned were as far away as Texas; and "[n]early all of the lawyers met their clients for the first time" only days before they were to appear. Cf. App. 20.

4. App. 27.

5. The transcript indicates, App. 20-23, that a list of the witnesses represented by counsel was read to the three prosecutors in open court and, on the following day, Goodwin was sworn, asked by the judge only the above question and

excused without examination by any of counsel. App. 27.

6. Complaint ¶¶ 17–18, App. 10. One of the witnesses is alleged to have been a paid informant and to have given to the Government information secured in the course of meetings with appellants and their counsel. Complaint ¶¶ 26–30, App. 12–13.

7. Complaint ¶ 3, App. 6. Several violations of criminal statutes are also asserted and appellants, invoking 42 U.S.C. § 1985 (1970), charge that these violations were the result of a conspiracy to violate their civil rights. Complaint ¶ 34, App. 15.

8. Meadow was the alleged conduit between the informant and the other appellees. Complaint ¶ 27, App. 12.

9. Complaint ¶ 7, App. 7.

ages and a punitive award of $100,000.[10] Goodwin, whose official residence was then in the District of Columbia,[11] was served personally and the others, each of whom resided in Florida, were served by certified mail.[12] The Florida defendants seasonably requested transfer of the litigation to the Northern District of Florida[13] or, alternatively, dismissal for improper venue and insufficiency of process.[14] The District Court denied the former motion but granted the latter,[15] and the question on appeal is whether this action may be entertained in the District of Columbia. We hold that it may.

---

**10.** Complaint, App. 16.

**11.** The District Court so found. *Briggs v. Goodwin*, D.D.C., 384 F.Supp. 1228 (memorandum and order Nov. 20, 1974), App. 38. Appellees do not contest that finding. See Brief for Appellees at 3, 4 n. 2.

**12.** See notes 54–75 *infra* and accompanying text.

**13.** See 28 U.S.C. § 1404(a) (1970).

**14.** At the same time, Goodwin moved for dismissal on grounds of immunity both as a prosecutor and as a witness, but his motion was denied. See *Briggs v. Goodwin, supra* note 11, (memorandum and order Nov. 20, 1974), App. 35–37, *aff'd*, 186 U.S.App.D.C. ——, 569 F.2d 1 (1977). Goodwin is not a party to this appeal.

**15.** The court rejected the motion to transfer on the grounds that venue in the District of Columbia was proper, adverting to "well established law that a plaintiff's choice of venue is given preference . . . ." *Briggs v. Goodwin, supra* note 11, (memorandum and order Nov. 20, 1974) (unreported), App. 38. On March 4, 1975, the court, repudiating that premise, issued the following additional order:

Upon consideration of the Alternative Motion of Defendants Stafford, Carrouth and Meadow to Dismiss this Action as to them for Lack of Jurisdiction over their Persons, Improper Venue, Insufficiency of Process and Insufficiency of Service of Process, the memoranda of points and authorities in support thereof and in opposition thereto, it appearing to the Court that service of process upon said defendants was made by certified mail; that the Complaint fails to allege the defendants transacted any business in the District

## I

The propriety of venue in the District of Columbia is measured by 28 U.S.C. § 1391(e),[16] which in pertinent part provides:

A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, . . . may, except as otherwise provided by law, be brought in any judicial district in which (1) a defendant in the action resides . . . .

The summons and complaint in such an action shall be served as provided by the

of Columbia or caused tortious injury to plaintiffs in the District of Columbia by an act or omission therein as required by District of Columbia Code § 13–423(a); that the action against said defendants could not have been brought in this Court prior to the enactment of 28 U.S.C. § 1391(e) and is not one in essence against the United States as required by § 1391(e); and that by reason thereof the Court lacks venue and *in personam* jurisdiction with respect to defendants Stafford, Carrouth and Meadow, service of process on them was insufficient, and the action as to these defendants should be dismissed, it is, therefore, by the Court this 4th day of March 1975:

ORDERED that the Alternative Motion of Defendants Stafford, Carrouth and Meadow to dismiss this action be, and the same hereby is, granted; and it is further

ORDERED that this action be, and the same hereby is, dismissed as to defendants William H. Stafford, Jr., Stuart J. Carrouth, and Claude Meadow.

*Briggs v. Goodwin, supra* note 11, (order Mar. 4, 1975) (unreported), App. 39–40.

Whatever the merits of the venue determination, one must wonder why the District Court did not hold the motion for transfer in abeyance until it had decided whether the litigation could continue in the District. See *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466–467, 82 S.Ct. 913, 915–916, 8 L.Ed.2d 39, 42 (1962) (transfer may be effected even absent personal jurisdiction over all parties in the transferor court, and in most cases is preferable to dismissal if the defect in venue can thereby be cured).

**16.** 28 U.S.C. § 1391(e) (1970), as amended by Act of Oct. 21, 1976, Pub.L. No. 94–574 § 2, 90 Stat. 2721–2722. The 1976 amendment does not bear on the questions in this case.

Federal Rules of Civil Procedure except that the delivery of the summons and complaint to the officer or agency as required by the rules may be made by certified mail beyond the territorial limits of the district in which the action is brought.

This litigation, against four federal officials, was commenced in the district wherein one of them officially resided.[17] The complaint alleges constitutional depredations wrought by activities "in [their] official capacity or under color of legal authority." [18] The suit thus fits within the ostensible coverage of Section 1391(e). Appellees suggest a gloss upon the statutory language, however, excepting from its purview any case in which a money judgment may be returned against a federal officer, and to this suggestion the District Court apparently acceded.[19] Our examination of the genealogy of the "Congressional English" [20] just set forth leads us to decline appellees' invitation.

The progenitor of Section 1391(e) was H.R. 10089,[21] a bill "[t]o permit a civil action . . . against an officer of the United States *in his official capacity . . .* in any judicial district . . . where a plaintiff in the action resides." [22] Asked for comments on the bill, the Department of Justice expressed reservations about its utility.[23] It explained that most suits against public officials, such as those seeking "damages from him personally for actions taken ostensibly in the course of his official duty but which the plaintiff claims are in excess of his official authority," were "against [him] in his individual capacity," [24] and therefore outside the scope of the proposed legislation. On the other hand, the Department continued, any litigation "against a Government official . . . in his official capacity would be the equivalent of a writ of mandamus" [25] which, by virtue of a historical anomaly, no federal court outside the District of Columbia could then issue.[26] Since H.R. 10089 would have conferred no mandamus jurisdiction and would not have applied to actions against officials "individually," the Department doubted whether its enactment "would serve any useful purpose." [27]

H.R. 12622 [28] was drafted to meet these and other [29] criticisms. Its first section extended mandamus jurisdiction to all of the federal district courts.[30] Its second section broadened the prior venue proposal to in-

17. See note 11 *supra.*

18. See text *supra* following note 16.

19. *Briggs v. Goodwin, supra* note 11, (order of Mar. 4, 1975), reproduced at note 15 *supra.*

20. *See Henderson v. Flemming,* 283 F.2d 882, 885 (5th Cir. 1960).

21. H.R. 10089, 86th Cong., 2d Sess. (1960).

22. H.R. 10089, 86th Cong., 2d Sess. (preamble) (1960) (emphasis added). This bill was in all pertinent respects identical to H.R. 10892, 85th Cong., 2d Sess. (1958), upon which no action was taken beyond referral to committee. H.R. 10089 proposed that the following language be codified as 28 U.S.C. § 1391(e):

A civil action in which each defendant is an officer of the United States in his official capacity, a person acting under him, or an agency of the United States, may be brought in any judicial district where a plaintiff in the action resides.

23. H.R.Rep.No.1936, 86th Cong., 2d Sess. 6 (1960) (letter of Deputy Attorney General Lawrence Walsh).

24. *Id.*

25. *Id.*

26. Compare *M'Intire v. Wood,* 11 U.S. (7 Cranch.) 504, 3 L.Ed. 420 (1813), with *Kendall v. United States ex rel. Stokes,* 37 U.S. (12 Pet.) 524, 9 L.Ed. 1181 (1838).

27. H.R.Rep.No.1936, *supra* note 23, at 6.

28. H.R. 12622, 86th Cong., 2d Sess. § 2 (1960), in *id.* at 9.

29. The Judicial Conference of the United States proposed additions that subsequently were adopted as 28 U.S.C. §§ 1391(e)(1), (2), (3) (1970). *Id.* at 5 (letter of Warren Olney, III, Director, Administrative Office of the United States Courts). Appellants rely only on subsection (e)(1), quoted in text following note 15 *supra.*

30. This grant was the prototype for what is now 28 U.S.C. § 1361 (1970), enacted along with § 1391(e).

clude suits directed at a federal official's activity whether characterized as occurring "in his official capacity" or "under color of legal authority." [31] The purpose of the new bill was "to provide readily available, inexpensive judicial remedies for the citizen who is aggrieved by the workings of Government,[32] but who would previously have been compelled [33] to sue in the District of Columbia by the pre-existing venue provisions, which were deemed "contrary to the sound and equitable administration of justice." [34] And the House Report specifically noted that "[t]he venue problem also arises in an action against a Government official seeking damages from him for actions which are claimed to be without legal authority but which were taken by the official in the course of performing his duty." [35]

The House passed H.R. 12622 [36] but the Senate adjourned before any action was taken on it. So, in the next Congress, it was reintroduced as H.R. 1960,[37] comments were again solicited, and again the Department of Justice asked that portions of the bill be "clarified." [38] Some proffered clarifications were adopted,[39] but notably the Department's suggestion that the venue provision be changed to "eliminate[ ] suits for money judgments against officers" [40] was not. Rather, both the House and Senate committees rejoined with the observation that the "venue problem" which the bill sought to rectify was as troublesome in damage suits against officials as in other sorts of civil litigation.[41]

[redacted] This colloquy between the Department of Justice and the legislative draftsmen demonstrates the legislature's comprehension and resolution of the issue before us. The conscious addition by Congress of language designed to extend Section 1391(e) to suits for damages against federal officials acting under color of legal authority, coupled with its adherence to that language despite highly respectable protest,[42] manifests beyond peradventure an intent to broaden venue in just such suits. Our duty is to hearken to the will of Congress as expressed, and the statutory mandate is clear.

We realize, of course, that other courts have entertained divergent views on the relation of Section 1391(e) to damage actions against federal officials.[43] We ac-

**31.** H.R. 12622, *supra* note 28, set forth in H.R. Rep.No.1936, *supra* note 23, at 9.

**32.** H.R.Rep.No.1936, *supra* note 23, at 3.

**33.** The House Report on H.R. 12622 focused on the time and expense involved in traveling to the District of Columbia to institute suit against officials or agencies located there, and the possibility that litigation commenced against agents in the field might be dismissed for want of venue over an indispensable superior located in Washington. H.R.Rep.No.1936, *supra* note 23, at 2–3.

**34.** *Id.* at 3.

**35.** *Id.*

**36.** 106 Cong.Rec. 18405 (1960). *Cf.* H.R.Rep. No.536, 87th Cong., 1st Sess. 1 (1961).

**37.** H.R. 1960, 87th Cong., 1st Sess. (1961), 107 Cong.Rec. 12157 (1961); H.R.Rep.No.536, *supra* note 36, at 5–6. See *id.* at 1 ("[a]n identical bill, H.R. 12622, passed the House in the closing days of the 86th Congress but was not acted upon by the Senate").

**38.** S.Rep.No.1992, 87th Cong., 2d Sess. 6 (1962) (letter of Assistant Attorney General (now Justice) Byron R. White), U.S.Code Cong. & Admin.News 1962, p. 2784.

**39.** Compare *id.* at 1 with *id.* at 6–7. The Senate passed the bill as amended without revealing debate. 108 Cong.Rec. 18783–18784 (1962). The House passed the Senate version with one change, also responsive to the Justice Department's suggestions, 108 Cong.Rec. 20093–20094 (1962), and the Senate acquiesced. *Id.* at 20079. *Cf. Peoples v. United States Dep't of Agriculture*, 138 U.S.App.D.C. 291, 295 n. 9, 427 F.2d 561, 565 n. 9 (1970) (noting the importance of the selective adoption of the Department's proposed revisions).

**40.** S.Rep.No.1992, *supra* note 38, at 6, U.S. Code Cong. & Admin.News 1962, p. 2789.

**41.** *Id.* at 3; H.R.Rep.No.536, *supra* note 36, at 3.

**42.** See note 39 *supra*.

**43.** The Fifth Circuit, in *Ellingburg v. Connett*, 457 F.2d 240, 241 (5th Cir. 1972), held that "Section 1391(e)(4) . . . may be a basis for venue" in a civil rights action "for damages

knowledge also that in *Relf v. Gasch* [44] we spoke to the subject in a manner that, in retrospect, seems susceptible of conflicting interpretations, but *Relf* does not clash with the result reached here. That case involved the propriety of a transfer of litigation to another district "for the convenience of parties . . . [and] in the interest of justice," [45] and the complaint hinted that some defendants might be subject to liability not only for activities under color of legal authority but also for others of a purely personal character.[46] Those possibilities could

not have been explored in the transferee district, for neither Section 1391(e) nor any other provision gave venue there,[47] and as a prerequisite to transfer "[v]enue must be proper in the transferee district" [48] for every defendant and on every claim for relief.[49] Moreover, a transfer is conditioned as well on the amenability of all defendants "to the process of the federal court in the transferee district at the time the action was originally filed" [50] and, apart from the inefficacy of process available in that district for any defendant sued only in a pure-

and injunctive relief against officers . . . of the United States," and remanded for a determination as to whether the factual predicate—the plaintiff's residence in the district—could be satisfied. The dissent apparently agreed that an action for damages might normally be brought pursuant to its provisions, but regarded the damage claim there advanced as a sham. *Id.* at 242. See *Driver v. Helms*, 74 F.R.D. 382 (D.R.I.1977). The District Court in this circuit has reached a similar result in a case involving alleged injury "as a result of defendants' fraudulent and defamatory statements, made in the course of their official duties," so long as federal employment continued to the time the action was filed. *Wu v. Keeney*, 384 F.Supp. 1161, 1168 (D.D.C.1974). *Cf. Benson v. United States*, 421 F.2d 515, 517 (9th Cir.), *cert. denied*, 398 U.S. 943, 90 S.Ct. 1861, 26 L.Ed.2d 279 (1970) (semble); *Thompson v. Kleppe*, 424 F.Supp. 1263, 1266 (D.Haw. 1976) (semble). See also *Kletschka v. Driver*, 411 F.2d 436, 442 (2d Cir. 1969) (dicta); *Rabiolo v. Weinstein*, 357 F.2d 167, 168 (7th Cir. 1966) (dicta). On the other hand, *Paley v. Wolk*, 262 F.Supp. 640, 642–643 (N.D.Ill.1965), *cert. denied*, 386 U.S. 963, 87 S.Ct. 1031, 18 L.Ed.2d 112 (1967) found § 1391(e) unavailable to a plaintiff apparently alleging that certain employees of the Patent Office had taken money from him on false pretenses, since "the action would be against the defendants personally rather than in their official capacities," as did *Davis v. Federal Deposit Ins. Co.*, 369 F.Supp. 277, 279 (D.Colo.1974), where damages were sought from an FDIC employee on grounds his negligence had facilitated the collapse of a national bank. Compare with these cases *Griffith v. Nixon*, 518 F.2d 1195, 1196 (2d Cir.), *cert. denied*, 423 U.S. 995, 96 S.Ct. 422, 46 L.Ed.2d 369 (1975), and *Green v. Laird*, 357 F.Supp. 227, 230 (N.D.Ill.1973), each seemingly concluding that *venue* under § 1391(e) was proper but that that section did not affect service requirements, which were deemed unmet, a matter discussed *infra* at note 58. Perhaps *Paley* and *Davis* may be reconciled with *Wu* and *Ellingburg*, for from the reports in the former cases it is unclear whether the injurious

action was alleged to have been taken under color of legal authority, and for aught that appears the courts may implicitly have found the activity to have been purely personal. *Cf. Griffith v. Nixon, supra*, 518 F.2d at 1196.

44. 167 U.S.App.D.C. 238, 511 F.2d 804 (1975).

45. 28 U.S.C. § 1404(a) (1970).

46. 167 U.S.App.D.C. at 240, 511 F.2d at 806. The plaintiffs in *Relf*, all minors, alleged that they were sterilized without their consent or the consent of their parents. They sued the United States—under the Federal Tort Claims Act, 28 U.S.C. § 1346(a) *et seq.* (1970)—and a group of individual defendants, all of whom were at one time federal officers or employees. *Id.* To be sure, each of the nine counts of the plaintiffs' complaint ceremoniously asserted that the individual defendants had acted within the scope of their offices and employments. But there were allegations readable as charges of misconduct unconnected with official duty or authority, and these left us unsure whether the plaintiffs really intended that the alleged wrongdoers' status as government officials should figure operatively in all of their counts. 167 U.S.App.D.C. at 240–241, 511 F.2d at 806–807.

47. *Id.* at 241 & n. 15, 511 F.2d at 807 & n. 15, citing *Paley v. Wolk, supra* note 43, 262 F.Supp. at 642–643, in which federal employees were being sued for receiving money under false pretenses, but the receipt was apparently "unrelated" to their official duties.

48. *Relf v. Gasch, supra* note 44, 167 U.S.App. D.C. at 241, 511 F.2d at 807 (footnote omitted).

49. *Id.* at 241 n. 12, 511 F.2d at 807 n. 12.

50. *Id.* at 241, 511 F.2d at 807 (footnote omitted).

ly personal role,[51] the fact that some defendants had left federal service prior to institution of suit "increase[d] the likelihood" that they were not subject to process emanating from the transferee court.[52] Consequently we remanded the case in order that the District Court might, by allowing amendments to the complaint, be afforded a reasonable opportunity to decide these weighty questions bearing on its power to transfer. Clearly, our presumption in *Relf*—that actions brought against persons who just happen to be, or to have been, federal officials are not within the ambit of Section 1391(e)—is by no means incompatible with our present holding that venue for damage actions against those who inflict injury under color of legal authority is governed by that section.

To the extent, then, that the District Court held that Section 1391(e) furnishes no basis for venue here, it was in error. That does not end the matter, however, for the order appealed from is predicated also upon insufficient service of process upon appellees.[53] To that issue we now turn.

## II

As we noted at the outset,[54] the Federal Rules of Civil Procedure govern service of process in cases laying venue under Section 1391(e), "except that the delivery of the summons and complaint to the officer or agency . . . may be made by certified mail beyond the territorial limits of the district in which the action is brought." [55] Appellees were served in just that manner which, they assert, was improper either because Congress did not intend the exception to apply to suits such as this one, or because such service is constitutionally deficient.

■ As for the first contention, the House Report on Section 1391(e) correctly noted that its expansion of venue would be of little avail unless coupled with a modification of service demands then levied by the Civil Rules.[56] Thus, while the amended section retains the rules intact for service within the forum district it empowers the district courts to make valid service outside the district whenever venue lies by virtue of Section 1391(e).[57] It also authorizes service by certified mail in such situations whenever service can be effected only beyond the boundaries of the forum district.[58]

---

**51.** We noted in addition that the transferee state's long-arm statute would not reach such defendants. 167 U.S.App.D.C. at 242 n. 18, 511 F.2d at 808 n. 18.

**52.** *Id.* at 242, 511 F.2d at 808. This was the ground for the concurring opinion, which deemed § 1391(e) otherwise available. *Id.* Cf. *Kipperman v. McCone,* 422 F.Supp. 860, 876–877 (N.D.Cal.1976); *Wu v. Keeney, supra* note 43, 384 F.Supp. at 1168.

**53.** *Briggs v. Goodwin, supra* note 11, (order of May 4, 1975), set out at note 15 *supra.*

**54.** See text *supra* at note 16.

**55.** 28 U.S.C. § 1391(e) (1970).

**56.** H.R.Rep.No.536, *supra* note 36, at 4.

**57.** See text *supra* following note 16 and note 58 *infra.*

**58.** See text following note 16 *supra.* As the House Report put it "[s]ince this bill is designed to make a federal official amenable to suit locally, the bill provides that [service on the official] may be made by certified mail outside of the territorial limits of the district in which the action was brought. In all other

respects, the summons and complaint is to be served as provided by the Federal Rules. . ." H.R.Rep.No.536, *supra* note 36, at 4 (emphasis added). Appellees read the Report's assertion that "where an action is only nominally brought against an official . . . service may be had in the manner provided by rule 4(d)(5)," *id.,* to imply a "negative corollary" that the service provision of § 1391(e) applies only to that situation. Brief for Appellees at 27–28. This inference is negated by the very next sentence in the House Report, which clearly contemplates that the "exception to the territorial limitation on service provided in this bill" is "equally applicable" to cases other than those within the compass of Rule 4(d)(5), such as, presumably, this one. H.R.Rep.No.536, *supra* note 36, at 4. Thus § 1391(e) invokes the clauses in Fed.R.Civ.P. 4(f) (specifying the "Territorial Limit on effective service") and Rule 4(d)(7) (service upon an individual defendant) providing for statutory exceptions to their dictates.

Appellants also urge that if service is made under Rule 4(d)(5) it is *per se* insufficient to bring an official's pocketbook into jeopardy. That Rule's only peculiarity is its direction that service be made not only upon the officer, but upon the United States as well. Appellants

Nowhere is there any intimation that these changes were to affect some cases controlled by Section 1391(e) and not others,[59] and indeed any exception would be difficult to justify. That venue exists in a particular district would hardly console a plaintiff unable to serve officials who, though responsible for his plight, had withdrawn beyond the limits of effective service. And Congress must not have been content to rely simply on state long-arm statutes,[60] for it chose to supplement them in the category of cases encompassed by Section 1391(e) by providing extraterritorial service of its own device.[61] We find the service effected here

to be fully within the ambit of congressional contemplation.

 Nor do we perceive any constitutional problem in the statute as applied to this case.[62] Appellees pitch their constitutional argument on their supposed lack of minimum contacts with the District of Columbia,[63] resting on cases[64] holding "that the Due Process Clause of the Fourteenth Amendment places some limit on the power of state courts to enter binding judgments against persons not served with process within their boundaries."[65] To the extent that this position presupposes that Congress' constitutional authority to provide

---

here apparently did serve the United States; yet if service upon the appellees was affected agreeably with § 1391(e), it is hard to see how the additional service might redound to their injury. To the extent that *Griffith v. Nixon, supra* note 43, 518 F.2d at 1196, and *Green v. Laird,* 357 F.Supp. 227, 230 (N.D.Ill.1973), suggest that service on the United States renders ineffective otherwise proper service on a federal officer, we refuse to follow them. Moreover, *Relf v. Gasch, supra* note 44, 167 U.S.App.D.C. at 242 n. 18, 511 F.2d at 808 n. 18, in no way conflicts with our interpretation. As we noted earlier, see notes 44–52 *supra* and accompanying text, our concern in *Relf* was that § 1391(e) —and Rule 4(d)(5)—did not extend to claims against officials sued *as* individuals, as opposed to claims deriving from action taken under color of legal authority.

**59.** See note 58 *supra.*

**60.** The District Court apparently gauged its jurisdiction by the local long-arm statute, D.C. Code § 13–423(a) (1973), and found it wanting. See note 15 *supra.* Precisely what measurement it undertook is unclear. If it assumed that its only vehicle for obtaining service was *via* that statute, it was, as indicated above, in error. If its reference was for the purpose of determining whether appellees had sufficient contacts with the forum to permit it constitutionally to exercise jurisdiction over them—the more likely possibility—it was similarly incorrect. See text and notes at notes 62–75 *infra.*

**61.** See H.R.Rep.No.536, *supra* note 36, at 4.

**62.** Appellees do not assert that service *via* certified mail is any less valid than personal service. Therefore, we do not pass on the question but merely note that the weight of authority might sustain the use of certified mail service in *in personam* actions such as this. Compare *Hess v. Pawloski,* 274 U.S. 352, 47 S.Ct. 632, 71 L.Ed. 1091 (1927), with *Wuchter v.*

*Pizzutti,* 276 U.S. 13, 48 S.Ct. 259, 72 L.Ed. 446 (1908). See also *McGee v. International Life Ins. Co.,* 355 U.S. 220, 221, 78 S.Ct. 199, 200, 2 L.Ed.2d 223, 225 (1950); *Mullane v. Central Hanover Bank & Trust,* 339 U.S. 306, 318–319, 70 S.Ct. 652, 656–660, 94 L.Ed. 865, 875–876 (1957). See generally Fox, *Motorists' Service of Process Acts,* 33 F.R.D. 151 (1963); Wilson, *Service of Process,* 39 U.Cinn.L.Rev. 487, 488–489 (1970); Note, *Service of Process by Mail,* 74 Mich.L.Rev. 381, 382 (1975) ("service by mail without a return-receipt requirement complies with . . . due process").

**63.** Appellants, who pleaded, *inter alia,* a conspiracy between appellees and Goodwin, see note 7 *supra,* take the position that discovery would reveal that appellees did have substantial contacts with the District of Columbia, Brief for Appellants at 10 and footnote, but that they were prevented from conducting discovery during the pendency of appellees' motion to dismiss. *Id.* at 6. Since we do not accept appellees' lack-of-contacts contention, we need not pass on this question.

**64.** *Hansen v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

**65.** *McGee v. International Life Ins. Co., supra* note 62, 355 U.S. at 222, 78 S.Ct. at 200, 2 L.Ed.2d at 225. *Cf. Hansen v. Denckla, supra* note 64, 357 U.S. at 253, 78 S.Ct. at 1240, 2 L.Ed.2d at 1298 ("it is essential [to state court or diversity jurisdiction] in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws").

for the sound operation of the federal judicial system [66] is limited by the same constraints that apply to extraterritorial service by state tribunals, it builds on sandy soil indeed. Whether or not Article III [67] mandated creation of any inferior federal courts at all,[68] it is a matter of general agreement that the discretion of Congress "as to the number, the character, [and] the territorial limits" of the inferior federal courts is not limited by the Constitution.[69] Congress might have established only one such court, or a mere handful; [70] in that event, nationwide service would have been a practical necessity clearly consonant with the Constitution.[71] That it was considered expedient to establish federal judicial districts in harmony with state boundaries [72] did not alter the scope of legislative discretion in this regard, and in fact Congress has, on occasion, provided for nationwide service.[73] While several cases have asserted apodictically that service outside a federal judicial district is governed by the same sort of "fairness standard" as is extraterritorial service by state courts,[74] this imputes

**66.** See *Hanna v. Plumer*, 380 U.S. 460, 472, 85 S.Ct. 1136, 1144, 14 L.Ed.2d 8, 17 (1965).

**67.** U.S.Const. art. III § 1 provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court and in such inferior Courts as the Congress may from time to time ordain and establish."

**68.** Compare *Cary v. Curtis*, 44 U.S. (3 How.) 236, 245, 11 L.Ed. 576, 581 (1845), with *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 330–331, 4 L.Ed. 97, 104 (1816). Compare J. Goebel, History of the Supreme Court of the United States, Antecedents and Beginnings to 1801, 246–247 (1971), with 1 Records of the Federal Convention of 1787, 124–127 (M. Ferrand ed. 1966). See also Warren, *New Light on the History of the Federal Judiciary Act of 1789*, 37 Harv.L.Rev. 49, 65–67 (1923).

**69.** *United States v. Union Pac. R. R. Co.*, 98 U.S. (8 Otto) 569, 602–603, 25 L.Ed. 143, 150 (1878). Accord, *Lockerty v. Phillips*, 319 U.S. 182, 187, 63 S.Ct. 1019, 1022, 87 L.Ed. 1339, 1342–1343 (1943); *Cary v. Curtis, supra* note 68, 44 U.S. at 245, 11 L.Ed. at 581. *Cf.* J. Goebel, *supra* note 68, at 247; 1 The Records of the Federal Convention of 1787, *supra* note 68, at 125.

**70.** See, *e. g., Martin v. Hunter's Lessee, supra* note 68, 14 U.S. at 331, 4 L.Ed. at 104. The early drafts of what became Article III provided for "one or more" inferior federal courts, but that provision was stricken without apparent explanation. 1 Records of the Federal Convention of 1787, *supra* note 68, at 116. See J. Goebel, *supra* note 68, at 210 n. 68. Indeed, The Federalist No. 81 (A. Hamilton) 544 (P. Ford ed. 1898) proposed that Congress "divide the United States into four or five or half a dozen districts; and to institute a federal court in each district, in lieu of one in every state."

**71.** See, e. g., *Mississippi Publishing Corp. v. Murphree*, 326 U.S. 438, 442, 66 S.Ct. 242, 245, 90 L.Ed. 185, 190 (1946); *Robertson v. Railway Labor Bd.*, 268 U.S. 619, 622, 45 S.Ct. 621, 622,

69 L.Ed. 1119, 1121 (1925); *United States v. Union Pac. R. R. Co., supra* note 69, 98 U.S. at 604, 25 L.Ed. at 151 ("[t]here is . . . nothing in the Constitution which forbids Congress to exact that, as to a class of cases or a case of special character, a . . . court . . . in which the suit may be brought, shall, by process served anywhere in the United States, have the power to bring before it all the parties necessary to its decision"); *Toland v. Sprague*, 37 U.S. (12 Pet.) 300, 328, 9 L.Ed. 1093, 1105 (1838).

**72.** The Judiciary Act of 1789, 1 Stat. 73 (1789), divided the United States into districts along state lines, except for establishment of districts in the Maine and Kentucky territories. This decision appears to have been motivated in part by the very spectre of nationwide service and the attendant inconvenience it might have caused. See J. Goebel, *supra* note 68, at 226, 460, 473; Warren, *supra* note 68, at 72. Thus, "a precedent was established, which is still unbroken [with but one exception, see Act of Feb. 13, 1801, ch. 4, §§ 4, 21, 2 Stat. 89, 96, repealed Act of Mar. 8, 1802, ch. 8, § 1, 2 Stat. 132] against the overlapping of state lines in the boundaries of federal judicial districts." P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, The Federal Courts and the Federal System 33 (2d ed. 1973).

**73.** See, *e. g.*, the instances cited in *Robertson v. Railway Labor Bd., supra* note 71, 268 U.S. at 624–625, 45 S.Ct. at 623–624, 69 L.Ed. at 1122; *Jaftex Corp. v. Randolph Mills, Inc.*, 282 F.2d 508, 512 (2d Cir. 1960); 4 C. Wright & A. Miller, Federal Practice and Procedure § 1125 at 522–528 (1968); Comment, 7 Rut.Cam.L.J. 158, 162 n. 7 (1975).

**74.** *E. g., Fraley v. Chesapeake & O. Ry.*, 397 F.2d 1, 3 (3d Cir. 1968); *Lone Star Package Co. v. Baltimore & O. R. R.*, 212 F.2d 147, 155 (5th Cir. 1954). *Fraley* relies on *Lone Star*, which in turn relies on *United States v. Scophony Corp.*, 333 U.S. 795, 818, 68 S.Ct. 855, 866, 92 L.Ed. 1091, 1106 (1948), applying the "fairness con-

a constitutional magic to lines that Congress can at any time redraw. As tradition alone[75] works no such necromancy, we must reject appellees' constitutional argument as well.

### III

We are requested by appellees at least to temper our view of the involved statute by its purportedly pernicious repercussions. Our answer must naturally be that it was for Congress alone to weigh those repercussions. Congress may not have anticipated that the flow of litigation of the sort at bar would rise from trickle to floodtide;[76] still we may not distort the statute to mollify its operation. If, as appellees melodramatically contend, application of Section 1391(e) as written "would subvert the orderly administration of the criminal justice system,"[77] it is Congress that should be alerted, for we are not at liberty to act in its stead.

To sum up, Section 1391(e)(1), providing as it does for venue in actions for redress of injuries inflicted by federal officials under color of legal authority, supports cognizance of this litigation in the District of Columbia. That section also sanctions the use of certified mail for extraterritorial service in this action, and as so applied is constitutional. These conclusions require us to reverse the District Court's dismissal of appellants' action against Messrs. Stafford, Carrouth and Meadow, and to remand the case for further proceedings.

*Reversed and remanded.*

---

siderations" of *International Shoe Co. v. Washington, supra* note 64, to a determination as to whether a British corporation could be subjected to suit in the United States. Whether an alien is amenable to suit in this country is, as Professor Rheinstein has noted, a question analogous to that presented when a state court attempts to exercise jurisdiction over someone not found in that state, and quite a different matter from applying such a test to a sovereign state's power to formulate jurisdictional tenets within its territorial limits. Rheinstein, *The Constitutional Bases of Jurisdiction*, 22 U.Chi.

L.Rev. 775, 786–787, 796 (1955). *Cf. Shaffer v. Heitner*, 433 U.S. 186, 197–198, 97 S.Ct. 2569, 2576–2577, 53 L.Ed.2d 683 (1977).

75. See note 72 *supra.*

76. It has been noted that between 1961 and 1970 the number of civil rights actions filed in federal courts increased 1346%—from 296 to 3,985. H. Friendly, Federal Jurisdiction—A General View 16 (1973).

77. Brief for Appellees at 26.